IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 FEB -9 PM 1: 50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ANETHA SIMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 03-PT-465-M |
| | ) | |
| GADSDEN STATE COMMUNITY | ) | |
| COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

FEB 9 2004

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Gadsden State Community College's

("Gadsden State")(also referred to as "the College") Motion for Summary Judgment, filed on

October 14, 2003, and defendant's Motion to Strike the testimony of April Works, filed on

December 8, 2003.

## FACTS[1] AND PROCEDURAL HISTORY

Gadsden State is a state community college located in Gadsden, Alabama.  The College

offers practical nursing as one of its instructional programs.  Plaintiff Anetha R. Simmons

("Simmons") is a licensed registered nurse who earned her bachelor in science nursing degree in

1977.  On September 7, 1979, Simmons began her employment with Gadsden State as a tenured

employee in the practical nursing program.  During her employment with Gadsden State, Simmons

taught various courses and supervised clinical experiences in various medical settings, including

Riverview Regional Medical Center ("Riverview"), a local hospital in Gadsden and the site of

---

[1]The court notes where relevant facts appear disputed.



Simmons's alleged infractions in Summer 2002 (discussed in detail below).[2]  In the fall of 2000,

Simmons taught Newborn/Maternal, Pediatrics, and Dosage/Pharmacology classes.

During the 2000-2001 school year, Gadsden State's full-time LPN staff included Simmons,

Donna Olander ("Olander"), Susan Mullins ("Mullins"), Portia Foster ("Foster"), and Evelyn Woods

("Woods"), while the part-time teaching staff included Belinda Fuller ("Fuller") and Audry Green

("Green").  Simmons, Foster, and Woods are African-American; the rest of the listed teachers are

Caucasian.

According to Jim Pitchford ("Pitchford")[3] and Connie Meloun ("Meloun")[4], over the years

the pass rate for Gadsden State students taking Alabama's license exam decreased.[5]  Specifically,

Meloun stated, the pass rate had decreased to 56.2% for the period between October 1, 2000 and

September 30, 2001.  Due to graduates' poor performance on the state exam, Gadsden State alleges,

it made several changes to the practical nursing program.[6]  During the 2001-2002 school year,

Foster, the then-director of the licensed practical nursing ("LPN") program, was relieved of her

---

[2] From her personnel file, Simmons attaches favorable student and supervisory evaluations from the years 1997, 2000, and 2001.

[3] Pitchford serves as the Assistant to the President of Gadsden State.

[4] Meloun is employed as the divisional chairperson for health services for Gadsden State.

[5] Simmons disputes this fact based upon Foster's testimony that pass rates had been consistently high until 1999 (when she arrived at the College), following state-prescribed changes in the length and content of the course of studies prescribed.  Simmons provides a certified copy of the LPN scores for Gadsden State for the 1992-2003 period.  Prior to this time the College had an exemplary record, Simmons argues, as reflected by the Chancellor of Post Secondary Education's commendation to the college for having the highest scores in the Southeast.  Defendant notes that this commendation was dated 1998.

According to the attached records, the court observes, the pass rates had declined from 1995-1999, going from 94% in October 1995-September 1996 to 76.60% in October 1998-September 1999.  From October 1999-September 2000, the pass rate was higher (85.29%) but then dipped the following year to the cited 56.82%.

[6] Simmons disputes defendant's suggested causation for the drop, alleging that the change in the length of the academic program came before the test scores dropped.  According to Simmons, she was never accused of being responsible for the drop in passing rate of LPN students on the State licensing exam.

supervisory duties and reassigned to teach in another program.[7]  At Simmons's fair dismissal

hearing, Foster testified about the dropping pass rate.[8]  At that time, Connie Meloun ("Meloun"),

the divisional chairperson for health services, personally assumed the responsibility for instruction

in the practical nursing program.

On May 2, 2002, Gadsden State alleges, Dr. Evelyn Woods ("Woods"), a black female who

had been hired in September 1, 2001 (teaching Pharmacology, labs, and clinicals), was appointed

by Meloun to serve as "Coordinator" of the LPN program.  *See* Woods Declaration.  However, in

her deposition, Woods testified that she was appointed Coordinator in September 2002, not May

2002.[9]  On December 8, 2003, Gadsden State provided a supplemental Woods affidavit confirming

that May 2002 was the correct date and the deposition testimony was in error – a fact plaintiff still

disputes.  In addition to personnel changes, Meloun asserted, Gadsden State implemented several

---

[7] According to Foster, Meloun asked her to accept this new RN teaching post in lieu of termination.  While Simmons says Foster testified to receiving no explanation for the ultimatum, defendant contends that plaintiff's brief provided no source for this fact.

During Foster's September 1999-September 2001 service as LPN coordinator, Foster testified, she evaluated the LPN staff, including Simmons.  Foster gave Simmons excellent evaluations in both 2000 and 2001.  While Simmons's 2000 evaluation noted a corrective action regarding timely arrival in the morning, Foster testified that Simmons immediately remedied this problem.  According to Foster, she never received negative student comments about Simmons, and the Riverview staff complimented Simmons.  Foster testified that there were never any concerns about timely arrival on the floor, safety risks, leaving the students unsupervised, or abusive communications.  On one occasion when Foster arrived to evaluate Simmons as well as Gadsden State instructors Mullins and Olander, all those instructors were in the cafeteria conducting their pre-clinicals.  Foster's testimony buttresses Simmons's statement that all instructors held pre-clinicals in the cafeteria, students were permitted to eat at that time, and none of the white teachers were charged with any infractions based on this practice.  Foster testified that she was not concerned about eating food during pre-clinicals.

[8] According to Foster, when she arrived in 1999, the College's curriculum had changed, and the College had changed from a quarter to semester system.  As a result, the LPN program had been shortened from eighteen to twelve months.  The State of Alabama dictated this change.  When the courses were shortened, Foster testified, the pass rates dropped.

[9] At her deposition, Woods testified that she was never Simmons's supervisor and did not have any supervisory responsibility in 2001-2002 over anyone, including the Riverview staff.  Woods never worked at the clinical site at Riverview and admitted that she still does not know where pre-clinicals are held.

curriculum changes to improve test scores.

According to Simmons, around December 12, 2001, she learned she would no longer be assigned as a classroom instructor effective January 3, 2002.[10] Furthermore, on May 2, 2002, after reviewing the summer teaching assignment, Simmons learned that she would not be teaching summer lecture classes. On May 22, 2002, Simmons filed her first EEOC charge against Gadsden State, alleging racial discrimination and retaliation under Title VII based on changes to her teaching assignments.[11] In Simmons's opposition brief, she attributes the teaching assignment changes to "ongoing racial discrimination and [] retaliation for having protested the treatment of minorities in the LPN program." In fact, Gadsden State alleges, Simmons was scheduled to work full-time during the summer of 2002, with clinical instruction and lab teaching responsibilities rather than lecture classes.

Meloun testified that these new assignments were not race-based but were intended to best utilize the skills and capabilities of the practical nursing instructors. According to the College, Meloun made these faculty assignments prior to Dr. Woods being named coordinator. While Meloun instructed Dr. Woods to make any program changes she felt would improve the quality of instruction, the College contends, Dr. Woods did not choose to alter the faculty assignments for the summer 2002 term.[12] Contrary to plaintiff's initial E.E.O.C. charge, defendant contends, Simmons co-taught a lecture class (LPN 104) with Woods during the spring of 2002. Additionally, Gadsden

---

[10] Defendant argues that these allegations (contained in Simmons's EEOC charges) are false, since Simmons co-taught a lecture class (LPN 104) with Woods during the spring of 2002. *See* Woods and Meloun Declarations.

[11] Defendant denies the truth of Simmons's multiple EEOC complaints, *see infra*.

[12] As argued earlier by Simmons, Woods's deposition indicates that she had no input into Simmons's Summer 2002 clinical assignment, since Woods did not become Coordinator of the LPN program until September 2002. Again, Woods's declaration has her attaining the post of LPN coordinator in May 2002.

State reiterates, Simmons was assigned a LPN laboratory class in Spring 2002.

During Summer 2002, Simmons was assigned to teach a clinical nursing program at Riverview. Students in the particular summer 2002 Riverview clinical at issue included Marilyn Douglas ("Douglas"), Laura Morgan ("Morgan"), Michelle Johnson ("Johnson"), and Kenneth Pollard ("Pollard").[13] According to Riverview Nurse Manager Reeves,[14] on June 17, 2002, Lisa Sims ("Sims"), the Riverview Charge Nurse on duty that day,[15] reported to Reeves that Morgan failed to change a wound dressing on a patient with nephrostomy tubes and then lied about it. Specifically, Sims described this incident as follows:

---

[13] In June 2002, Simmons asserts, an unidentified College employee phoned Pollard, asking him to testify against Simmons. Defendant asserts that any such statement is inadmissible hearsay.

Pollard stated that the 2001-2002 clinical class began with 68 students but only 18 graduated. He stated that several students in the class complained a great deal, particularly about changes in the clinicals and giving out medications to patients. Pollard further stated that he attended clinicals with some of the complaining students, *see infra*, and never heard Simmons use vulgar language. However, Pollard testified to hearing Olander (another instructor) use vulgar language. Neither Woods nor Meloun spoke with Pollard regarding Simmons. After his interview with Dean Jolly, Pollard asserted, he never saw the results of the interview. Pollard has denied that it probably accurately reflected his answers.

Defendant references Pollard's admission in his sworn statement that he has been charged with murder for beating an individual in Lincoln, Alabama, where Pollard is a police officer. The court is not aware of the significance if he has not been convicted.

[14] Reeves served as Nurse Manager of the Riverview Third Tower ("3T") from May 2000 until October 2003 and is currently the Interim Manager of Riverview's coronary care unit. Reeves provided a sworn statement.

[15] In March 2003, Sims was promoted to the position of Nurse Manager of Riverview's Telemetry Unit of 3T. Prior to this assignment, Sims worked for ten years as the 3T Charge Nurse and Assistant to Nurse Manager. Sims reportd to Reeves. Sims supervised all nurses on the floor, arranged staffing, and handled day-to-day problems. According to Sims, the floor she supervised had twenty rooms and a thirty-two patient capacity. Sims provided a sworn statement.

Sims stated that she had worked with Simmons each year, as the students moved their clinicals on the floor. Sims recollected that Simmons was stern and would not let a student on the floor if he or she was unprepared. Sims stated that that Simmons would come onto the floor a day early in order to identify patients that would serve as good clinical experiences for her students. During the ten years that Simmons conducted clinicals on 3T, Sims stated, she never heard Simmons use abusive or vulgar language in the presence of patients or students. Sims stated that there had never been a variance report written on Simmons or any of her students, although she did recall a problem during the week that Simmons was taken off the floor on June 21, 2002. This problem involved Morgan, one of the Simmons's students, *see infra*.

. . . I gave Laura [Morgan] a report on this patient, and I told her that this
patient had bilateral nephrostomy tubes, and that this patient had dressing
changes to be done daily. [Laura] asked about the dressing changes, and I told
her the patient had come in from home.  She's a young lady in her forties.  The
patient had a preference as to how her dressings were done, and I told her to ask
the patient.  I said, "She's young.  She can tell you.  They've been taking care
of these at home for some time."  That was the last that I heard from Laura until
she came back, and I overheard her giving report back on this same patient to the
nurse who had accepted the patient.  I asked at that time about the dressing changes,
and she said, "I've not done the dressing changes."  I said, "Well, the dressing
changes should have been done in the morning hours along with bath and
personal care."  She said, "Okay."  This was probably 2:30 or 3:00 in the afternoon,
and she came back and said, "About those dressing, Ms. Simmons said we would
not have time to change the dressings."  I thought that rather strange . . . .
[b]ecause Ms. Simmons doesn't work that way . . . .
As soon as the students left the  floor, I called Ms. Simmons to the side, . . . and
I asked Ms. Simmons, and she
said, "You have got to be kidding."  I said, "No, ma'am, this is what Laura
told me." [Simmons] said, "I was upset with Laura because Laura had not done the
dressings, and Laura said that you [Sims] had said 'Don't worry about it.  We'll take care
of it.'"
. . . . Ms. Simmons said, "You've got to be kidding.  Laura told me that you would
take care said don't worry about it; that you-all would take care of it," meaning the
nurses on the floor would take care of it.

Although a nurse would have been counseled for the incident, Sims stated, Morgan as a

student was not written up.  Regarding Sims's assertions, defendant admits the source for the

statements but "disagrees with many portions of the statements and does not concede to such

points."[16]

On June 19, 2002, Meloun received complaints from students Douglas, Morgan, and

Johnson.[17]  On June 20, 2002, Dean Jim Jolly ("Jolly"), Dean of Instruction at Gadsden State,

informed Culverhouse of two students' allegations against Simmons.  According to Dean Jolly,

---

[16] However, the court observes, defendant fails to specify particular points of disagreement.

[17] In May 2002, Simmons notes, students took her to dinner and gave her a "thank you" card which was
signed by the same students who complained about Simmons on June 19, 2003.  By Simmons's account, students
Morgan, Hill, and Johnson had difficulty taking instructions from her, and one had received a poor grade.

Douglas advised him, Meloun, and Dr. Woods[18] that the students at Riverview were continually late arriving on the floor after pre-clinicals.  Douglas testified to the following: students reported at 6:45 for the pre-clinicals, after which time Simmons would eat breakfast; as a consequence, the students and Simmons would get to the clinical floor at 9:00 a.m. instead of the customary 8:00 a.m., causing the students to be late starting medication dispensation which was to be given at 9:00 a.m; on June

---

[18] To the contrary, Simmons argues, Woods testified that the only student complaint she heard was that Simmons expected too much of students.  However, the court notes, the pages cited by plaintiff (pp. 50-51) of Woods's deposition, do not support this contention because the remarks appear to have been made about instructor Mullins, not Simmons.  Woods testified: "*Q: Did any students ever come to you with reports of problems with Mullins that they were having trouble with her and how she behaved?* A: Yes.  *Q: What kind of problems did they report to you?* A: They have reported in the past that she expected too much out of them; that she expected maybe more than they could accomplish.  That she would tell them that they didn't need to do thinks like they done them.  They didn't need to do that again.  Those kinds of things."

In her deposition, Woods explained, her only role regarding allegations against Simmons was accompanying Jolly (at Meloun's request) to speak with on-site nurses at Riverview after the LPN student allegations surfaced.  Woods never saw the Jolly memo about the student allegations.  The following exchange occurred between plaintiff's counsel and Woods: "*Q: What was the situation?  What was in your mind as the situation before you got to Riverview?* A: Well, I understood that some students had filed a complaint about Ms. Simmons's behavior.  *Q: When you say filed, a written complaint?* A: A written complaint about Ms. Simmons' behavior.  *Q: What was your understanding of the contents of the written complaint?* A: That there had been some use of profanity and comments of sexual connotation." (Woods also refers to allegations of late meds and belittling that Meloun conveyed to her).  Woods explained that she was not asked to meet with President Culverhouse or to give a recommendation on the Simmons's matter to anyone.  According to Woods, Dean Jolly did not ask her whether Simmons should be taken out of service.

Jolly did not mention the term "blow job" in this meeting, according to Woods and Reeves.  Woods apparently perceived her role at the meeting as "active listener," while conceding that she had never been Simmons's supervisor.  After the meeting, Woods never spoke with Jolly about Simmons.  According to Woods, Reeves and Sims did not confirm the student allegations.

According to Simmons, Woods testified that the Riverview employees complained about certain LPN students during that rotation and described a specific incident involving the negligent failure of one student to change a wound dressing, which Gadsden State contests.  The court provides part of Woods deposition testimony:

*Q: When you were at that little meeting with Jolly and the two nurses, was there not a discussion about Laura Morgan being accused of not changing a dressing properly, and it may not have happened, but did they talk about Laura Morgan at that conference?*
A: I don't recall that they talked about Laura Morgan specifically.
*Q: Did they talk about a student failed to change a dressing?*
A: They talked about a number of things with students or with Ms. Simmons, but I don't recall any specific allegations about students or any names.
*Q: Those two nurses actually complained about the students, didn't they?*
A: They said some things.

7

19, 2002, the class did not finish dispensing 9:00 a.m. medications until after 1:00 p.m; Simmons frequently cursed in front of students both in the lobby and around patients and staff, using words such as "damn," "bitch," "shit," "hell," and "mother fucker"; and Simmons belittled students in front of others including Riverview staff.   Morgan, another student, similarly complained about Simmons's cursing.   Both Douglas and Morgan also reported that Simmons discussed giving her husband oral sex at a preclinical in front of other students.[19]

President Culverhouse alleges that such language in front of students violated Gadsden State's zero tolerance policy for sexual harassment of students and/or employees.   Simmons counters: "The so-called sexual harassment policy alleged to have been violated was not presented by defendant at any time during the course of this employment dispute or litigation."   Culverhouse

---

[19] This allegation, the court notes, also appears in an addendum to the June 24, 2003 Jolly memo to Culverhouse, which allegedly summarizes student answers to questions asked by Jolly in his interviews of them. The addendum read:

> Have you ever heard Ms. Simmons use vulgarity/profanity?
>> A. Yes.  I have heard her use vulgarity.
>> B. Yes!!! In the lobby at RRMC.  It does not offend me because I have heard everything since I worked at the Steele Plant . . . . But in the hospital?  She says G.D. a lot which offends me as well as others.  **She talks about James, her significant other, getting a blow job.  Marilyn Douglas was with me that day it happened.  She was doing make-up work because of her daughter's surgery so you can find out the exact date by asking Marilyn when her daughter had surgery.**  Stephanie Jordan, in another class, heard her call a patient a "bitch."  Marilyn McCowley who dropped also heard it.
>> C. Yes.  In front of patients, staff and students.
>> D. She uses a whole lot of vulgarity.  She said in med rooms and cussed; she cusses in pre- and post-clinicals.
>> E. Yes, she uses profanity in front of students.  Not in front of patients.
>> F. No.
>> G. In pre-clinical, she said, "hell" in the lobby loud enough for everyone in the lobby to hear.
>
> (Emphasis added).
>
> These responses allegedly correspond to the following students: A (Marilyn Douglas ), B (Michelle Johnson), C (Sue Willoughby), D (Sheila Hill), E (Rita Wilson/WATSON), F (Kenneth Pollard), G (Laura Morgan)
>
> While plaintiff argues that Jolly testified to not remembering writing any memos to Culverhouse on the matter except for the June 20[th] memo, the plaintiff does not appear to question the existence of this later memo.

further alleged that Gadsden State had terminated other white male and female employees for similar harassing or sexually inappropriate statements and behaviors.[20] Simmons highlights Culverhouse's testimony that she did not speak with any current or former students regarding Simmons but based her knowledge of the students' allegations on a memo authored by Meloun on June 20, 2002[21] as well as a memo from Dean Jolly dated June 20, 2002.[22] Simmons alleges that she never saw these memos until after her termination.

---

[20] According to Culverhouse, these previously terminated employees included Dr. David Tipton, William Balke, and Joyce Wilkerson. Apparently, the court observes, plaintiff's submissions do not address this allegation.

[21] The Meloun memo, Simmons contends, contained the alleged "verbatim" allegations of four of Simmons's LPN students from the summer 2002 clinical program at Riverview. These allegations included:

   a. late getting to the floor;
   b. late with the meds;
   c. pre-clinical held in cafeteria and time wasted talking;
   d. falls asleep while doing students' notes in the afternoon;
   e. says "God damn" and "shit" in front of students, staff and patients;
   f. blames students for being late on the floor and with meds;
   g. required paper that was not on the syllabus;
   h. hands are crippled and it takes her a long time to do things; and
   i. blurted out "God Bless the USA" in the Emergency Room.

According to Simmons, no other Gadsden State instructor had been admonished for holding pre-clinicals in the cafeteria. Simmons also observes that none of the allegations in the Meloun memo included the sexual harassment allegation that Simmons "described a sex act." Simmons denied being late to the floor, using vulgar language, leaving students unattended, or falling asleep in class. According to Simmons, the allegations were made shortly after Morgan was reprimanded by Simmons for failing to change a wound dressing.

[22] The Jolly memo contained the following allegations made by two of the complaining students:

   a. getting on the hospital floor late because Simmons eats breakfast;
   b. dispensing meds late and blaming the students for late meds telling them "to get a move on";
   c. cursing "frequently" in the hospital area (saying "God damn");
   d. assigning students "impossible tasks";
   e. requiring work not listed on the course syllabus;
   f. not teaching how to change a wound dressing; and
   g. belittling students.

Like the Meloun memo, plaintiff contends, the Jolly memo did not mention sexual harassment or that Simmons "described a sex act." However, see supra note 19.

On June 21, 2002, Gadsden State placed Simmons on administrative leave.[23] That same day, Jolly reported to Culverhouse that he had delivered the notice and relieved Simmons of her duties. Simmons was promised that she would be given a statement of the allegations later in the day. According to Jolly, he told Simmons:

> This was not a game of 'gotcha', that because lives could possibly be endangered at the hospital/clinical site, it was necessary for a thorough investigation to be done. I told her that after the allegations of late meds and other things were investigated, she would have an opportunity to tell her side of the story, if there was any substance to the allegations. I reminded her that this was an investigation, not an accusation.

Shortly after Simmons's suspension, Jolly and Woods met with Riverview medical staff Reeves and Sims. This was Jolly's and Woods's first time on the floor. This meeting was arranged after Reeves called the College to inquire about Simmons's absence from her duties at the hospital.[24] Before the meeting, which was held in the locker room on the floor, Reeves stated that she had never met Jolly or Woods.[25] Sims testified that she explained that pre-clinicals historically were conducted

---

[23] According to Culverhouse, she stated: "I am placing you on leave pending the outcome of an investigation into complaints by students regarding your supervision and instruction in the clinical setting."

While Simmons contends that Jolly's first meeting with Simmons after her suspension was on July 15, 2002, defendant notes that there is no listed source for this statement and thus it cannot admit or deny the source.

[24] According to Reeves, she was never consulted prior to Simmons being suspended from work.

[25] Regarding this meeting, Reeves testified:

They asked us – to the best of my recollection, they asked us about a conference room. I told them we had no conference room. They asked us if we hear Ms. Simmons use abusive language to her students or the patients or intimidation and we told them we had never heard her use abusive language to the patients or the students . . . . They also asked about communication, and we informed them that she communicated with me, with the staff nurses, and communicated the care provided by her students, and communicated a patient report on a patient to the nurses.
They asked if she left the floor with the students unattended. We told them that she did not leave the floor with the students unattended; . . . She's one person . . . . She can't be with each of them all the time . . . . and that if she ever left the floor, when she left the floor, she communicated to the charge nurse or me that she was leaving the floor, and we would oversee anything going on with the students. They asked if her group arrived to the floor in a timely manner, or if her group arrived late. We informed them that the timing of their arrival was not of importance to us; that patient care went on 24 hours a day; that the nurses were responsible for patient care. Dr. Woods talked about medications being administered late. We informed Dr. Woods of the dispensing

in the cafeteria area, in a quiet corner, because of the chaos on the floor.

After Jolly relayed student allegations against Simmons, Sims: (1) denied the allegation that Simmons "intimidated" students, explaining that a certain amount of respect was needed on the floor and with their teacher; (2) denied the allegation that Simmons used vulgar language in front of students and patients; (3) denied the allegation that the students had been late to the floor that week, explaining that students have no set time to arrive on the floor as far as the Hospital is concerned, (as the nursing goes on twenty-four hours a day, seven days a week, with qualified nurses on each shift to care for patients), that delays were inevitable in the administration of medications and were not Simmons's fault, and that there should be no problem with Simmons going to the pharmacy to get the medications for her students because she kept the nursing staff informed; and (4) denied that she had ever received a complaint about Simmons leaving the floor.

Furthermore, Sims testified, she was aware that the students complained when Simmons held them past 3:00 p.m. to complete their work.  Sims stated that neither Jolly nor Woods mentioned 'blow job' or Simmons's crippled hands (arthritis) as part of the student allegations.  Sims stated that the particular summer group of students were "outspoken" when talking to Simmons to the point of rudeness and were also outspoken when talking about Simmons to others.  Sims stated that she had never seen a group act like this before.  Following this meeting, Sims testified, no College official contacted her again.

On June 23, 2002, Culverhouse received a memo from Jolly regarding the meeting with

---

machine we had for our medications, and how it was impossible for every patient to receive their medication at the exact time they were supposed to receive it and how sometimes the medications were delayed because of the pharmacy.  We did inform her of the process if someone was not available from the pharmacy to give the medicines, to bring the medicines up, that we sent someone down to pick them up, if we had someone available.  If no, we had to wait . . . . I can't think of any other questions that they asked.

11

Riverview medical staff.[26]  Jolly reported that Reeves and Sims stated that this group of LPN students had a bad attitude toward Simmons.  Sims described Simmons as "very discreet, very professional."  Both Riverview staff members stated that they had not heard Simmons use inappropriate language.  Reeves informed Jolly that Morgan had been reprimanded by Simmons for failing to change a wound dressing.  In Reeves's sworn statement, she said that she received no complaints about Simmons during her time as Nurse Manager at Riverview[27] and had received no reports of problems with LPN students who did rotations on 3T.  According to Reeves, 3T does not have a conference room; rather, pre-clinical conferences for LPN students were and are still held in the cafeteria/vending machine area.

On June 24, 2002, Culverhouse received correspondence summarizing interviews Dean Jolly conducted with the seven students enrolled in Simmons's clinical class at Riverview.  Culverhouse had not given Dean Jolly specific instructions on how to conduct the interview.  Several other students confirmed certain problems with Simmons's instruction, specifically noting the delays in dispensing medication.  In addition to the actual students in the summer Riverview clinical at issue, Dean Jolly asked one question to Frank Ivy, a Gadsden State student who had other clinicals with

---

[26] In Jolly's deposition, Simmons argues, Jolly conceded that this meeting produced no evidence that patient safety had been compromised.  However, defendant disputes this characterization, stating that there was no source listed for this alleged concession.   Regarding late medications, Jolly stated that he never consulted the hospital pharmacist about these allegations.

[27] Reeves stated: "[Simmons was] energetic, informative, [and] kept me . . . or my charge nurses informed about what was going on with the patients and with her students."  Reeves further stated that she never heard inappropriate language on the floor and felt that student/patient interaction was appropriate.  Reeves denied that patient care was compromised because of late "meds," explaining that late meds can happen with or without LPN students on duty.  According to Reeves, meds are the hospital staff's responsibility; no variance reports or verbal report regarding late meds had been attributed to either Simmons or her students.

Simmons that year.[28]

On July 3, 2003, Simmons filed her second EEOC charge alleging retaliation based on her suspension. On July 25, 2002, Jolly met with Simmons for the first time after her suspension.[29] On July 30, 2002, Culverhouse notified Simmons of its intent to terminate her employment (no mention was made of sexual harassment or "describing a sex act"). According to Culverhouse, she decided to terminate Simmons based on Meloun's and Jolly's suggestion.[30] At the time Culverhouse sent this notice, she had not reviewed Simmons's evaluations[31] or personnel file. Defendant states that

---

[28] Simmons relies upon the following information from Ivy's sworn statement. According to Ivy, he is currently employed as an LPN Shift Nurse at Etowah County Detention Center. While attending the College, Ivy served as Vice President of the class for the LPN program between August 2001-August 2002. During his time at Gadsden State, Simmons taught dosage calculations and clinical rotation at area medical sites. Ivy attended classes with the complaining students (Douglas, Johnson, Willoughby, Hill, and Morgan). Ivy stated that those students never complained to him about Simmons in the way they complained to Jolly and Meloun.

Ivy alleged daily contact with Simmons and disagreed with allegations made by three LPN students about vulgar language, getting students to the floor on time, delivering meds in an untimely fashion, leaving the floor unattended, eating during pre-clinicals in the cafeteria, and falling asleep while reading notes. According to Ivy, Jolly only asked him one question: whether Simmons had called him after she had been suspended. He stated that he called her and she called him back. Ivy has denied any reluctance to talk to Jolly about Simmons.

However, defendant notes, Ivy did not attend the clinical in which the alleged infractions occurred, as noted in Ivy's sworn statement, "Of course, now you understand that I wasn't in that group at Riverview, that I am giving you my answers based on the two other clinicals that I was with [Simmons]."

[29] Between Simmons's suspension and this meeting, Simmons notes, Jolly neither communicated with Simmons about the reasons for her suspension nor furnished Simmons a list of the complaints against her by students Douglas and Morgan. Furthermore, Simmons alleges, Jolly never accused Simmons of sexual harassment or using the term "blow job" at that meeting. Countering this latter statement, Gadsden State "vehemently denies that Ms. Simmons was not made aware of such complaint regarding the use of vocabulary."

According to Simmons, she was not aware of the "blow job" allegations until the Fair Dismissal Hearing, and the allegations regarding sexual harassment surfaced in the College's statement to the EEOC dated August 23, 2002. Defendant disputes this as follows: "Defendant denies such and clearly from all termination letters previously submitted to the Court, her abuse of language was known to Ms. Simmons."

[30] Culverhouse testified to awareness of Simmons's EEOC charges filed on May 22nd, July 3rd, and September 19th, 2002, and discussing the charges with Meloun, Jolly, and possibly Pitchford. Culverhouse admitted that she never consulted with students or faculty aside from the stated employees regarding the content of plaintiff's EEOC charges.

[31] According to Culverhouse, the State Board of Education requires yearly evaluations of instructors. There are 150 to 200 full-time instructors at the College. The College has an annual budget of $30 million dollars.

it cannot admit or deny this "fact" because there was no source cited for the evidence. Furthermore, Culverhouse admitted, she did not speak with anyone at Riverview or with any current or former LPN students; she also admitted that she does not know where the Riverview pre-clinicals are held.

On September 9, 2002, Simmons attended a predetermination hearing with Culverhouse, where Simmons was allowed to present witnesses. At this conference, Culverhouse read a letter sent to her from Riverview Nurse Manager Reeves detailing the conversation Reeves had with Jolly and Dr. Woods during their visit to 3T. In this letter, Reeves complimented Simmons as follows: calling Simmons "a welcome sight on our unit"; stating that her staff enjoyed "mentoring" the LPN students until the summer of 2002; recounting an incident involving one of the students who failed to change a wound dressing and lied about it; noting that Simmons took "immediate and professional action to ensure the patient's needs were met"; denying any problems with lateness of students on the floor or lateness in dispensing medications; denying allegations that Simmons used abusive or inappropriate language and inviting Culverhouse to call Reeves on her digital pager.[32]

At the predetermination hearing, Simmons reported an "all white" teacher-student graduation party in August 2001.[33] By Simmons's account, Meloun and certain Caucasian LPN instructors

---

[32] Simmons notes Culverhouse's testimony that she never communicated with Reeves or followed-up on the letter.

[33] Regarding the graduation party, Foster testified, she would be concerned if students and teachers were fraternizing and drinking together at a private party. She also testified that it would concern her if the party was attended exclusively by Caucasian students and teachers. Simmons notes that the Fair Dismissal hearing chairman would not permit Foster to testify to racial issues experienced at the College, stating that the charges against Simmons were not racially based. Specifically, the Chairman stated: "I don't think any racial matters were included in the charges . . . . It's not covered by the pleadings, then I don't think it's admissible."

As evidence of alleged racially motivated remarks at the party, plaintiff relies on the October 18, 2003 sworn statement of April Works, a 2000-2001 LPN student who attended the party. According to this statement, all the LPN teachers were in attendance except Simmons and Foster (both African-American). After several students expressed concern about Simmons teaching them next year, Works testified, Meloun announced that Simmons would not be there much longer, specifically stating: "Don't worry; she's [Simmons is] not going to be here . . . that black bitch is not going to be here that much longer." Works also stated that instructor Mullins, in Meloun's

14

(Mullins, Donna Ford ("Ford"), and Olander)[34] attended a private graduation party, where Meloun

allegedly promised the students that Simmons was going to be gone soon.  According to Simmons,

Culverhouse testified that since the students had completed their studies, the College did not need

---

presence, called Simmons a "nigger."

Works also stated that she and other students had been encouraged by their teachers to go to Meloun (not to Simmons) about previous problems with Foster, leading to Works's belief the students were being used to get Foster fired.  According to Works, one of the part-time teachers informed her that after Foster's firing, Simmons was next because she was black.  Later, Works alleged, the students unsuccessfully petitioned to get Foster as their graduation speaker.  Works described Foster more like a college teacher than the other teachers (Olander and Mullins) who were more like friends.  Works denied that Simmons was guilty of the infractions cited by the College, including using vulgar language and discussing sex in class.  However, Works testified, Olander and Mullins cursed in front of students and Ford discussed with students her lack of a sex life.  Works also denied that there was any set time to be on the floor at clinicals.  Works agreed that meds were sometimes late because of curriculum changes and that the timely administration of medications presented an ongoing problem for nurses.  According to Works, no nurse on the clinical floor ever had ever complained about "lateness" to the floor or about holding pre-clinicals in the cafeteria (and allowing students to eat then).  Finally, Words denied that Simmons had belittled students, noting that Fuller had done so and "yelled" at students at the nurse's station.

Defendant strongly disputes this evidence and informs the court of alleged major inconsistencies between the new sworn statement and Works's earlier deposition testimony in front of the Fair Hearing Dismissal panel and opposing counsel.  In her earlier deposition testimony, defendant contends, Works never alleged (1) that Meloun announced that Simmons would be terminated; (2) that Meloun or Mullins used racist language; or (3) that the party's exclusion of African-Americans was intentional and based on racial animus.

At the Fair Dismissal hearing, defendant contends, Works testified to the following: (1) Mullins not Meloun made a statement to the effect that Simmons would not be teaching pediatrics any more and that "nobody needed to worry [about Simmons], the problem wouldn't be around much longer"; (2)  Meloun was in the vicinity of Mullins's statement (because of a connected kitchen and dining room) but Works did not know whether Meloun heard Mullins's statement or not; (3) significant drinking was going on that night; and (4) Works did not know whether one of the restrictions to the party was "no blacks" (Works testified "I have no idea about that.  All I know is that when I was invited I was told not to discuss it with anybody else).

Based on the foregoing, defendant contends: "Most interesting is the change in the testimony regarding what was said at the party and who said what.  Under examination by both Gayle Gear [plaintiff's attorney] and Cliff Callis [defendant's attorney], the only statements that April Works could testify to are made by Ms. Mullins not Connie Meloun.  No where in this testimony did Ms. Works ever allege that Mullins used the word 'nigger' or that Meloun used the word 'black.'"  Further arguments by the parties about this matter are discussed infra in the motion to strike section of this memorandum opinion.

[34] At the Fair Dismissal Hearing, Simmons alleges, Olander testified that she thought it was acceptable to drink at a private party with students.  Olander also admitted cursing in front of students.  Simmons avers that Olander is still employed with Gadsden State.

to investigate these allegations.[35]  According to Simmons, Culverhouse stated that she never

followed up on the allegation by Simmons of retaliation, which defendant disputes.

On September 10, 2002, the College sent Simmons an official notice of termination.

According to Culverhouse, the termination was due to Simmons's behavior in the 2002 summer

clinical.[36]  On September 19, 2002, Simmons filed another EEOC charge contending the

---

[35] Gadsden State disputes this characterization of Culverhouse's statement, providing the following Culverhouse testimony:

> *Q: I know we've just smiled about the fair dismissal hearing, but there was some allegation at the hearing in August and September of 2001, there was a party; allegedly it was kind of student party, but certain faculty were invited, there was drinking at that party. Did you ever follow up on that particular allegation to see if it was true or not?*
> A: No, I didn't.
> *Q: Was it anything that you were concerned with, the allegation itself, concerned with teachers drinking with the students at a private party?*
> A: Had it been a College function, I would have been concerned, yes.
> *Q: So, it was your understanding it was in some private home, and that the teachers were there?*
> A: It was my understanding it was in a private home and that it was subsequent to the completion of the work and grading for the students so that they were technically no longer students at the College when the party occurred.

Additionally, Gadsden State contends, Culverhouse's deposition at the cited pages did not refer to her awareness of an "all white" teacher student graduation party.  Gadsden State argues: "There is a reference to 'teachers drinking with students at a private party.'  However, there is no indication in any of the testimony or questions asked on page 71 or Dr. Culverhouse's deposition that indicates any sort of racial make-up to the party."  Defendant also denies that Culverhouse's deposition at pages 71-72 supports the fact that "during a discussion of Simmons, Meloun promised the students that Simmons was going to be gone soon."  According to Gadsden State, the deposition clearly does not contain such a statement or testimony.  Finally, Gadsden State denies the source for plaintiff's statement that Culverhouse never followed up on on Simmons's retaliation allegation.  When asked "would it be correct that you made a good-faith effort to talk to individuals before you came to that conclusion [termination], Culverhouse responded "yes."

[36] The termination letter alleged:

a. failure to organize and direct clinical nursing students so that patient medications were administered on a timely basis.  This failure in administering medications as prescribed by physician's orders constituted an endangerment to patient safety and was inappropriate instructional behavior for students engaged in a critical learning activity.

b. using student clinical time to eat breakfast and engaging students in non-instructional communications during the time designated for pre-clinical conferences and clinical activities.

c. leaving students unsupervised on the floor on numerous occasions while you made trips to the pharmacy for patient medications instead of sending students.

d. abusive communications in the presence of students, hospital staff, and visitors to the hospital in violation of the Gadsden State Community College Employee Conduct Code outlined in the faculty handbook in Section F/1.12.

e. verbal abuse of students and your compromising patient confidentiality by conducting pre-clinical

employment actions against her were unjustified and in retaliation for exercising her Title VII rights.

The Alabama State Board of Education requires posting of new jobs. In 2002, the year Simmons was terminated, Gadsden State posted no jobs in the LPN program. After Simmons was terminated in September 2002, the College changed the status of three Caucasian LPN instructors to the program: Ann Haynes ("Haynes"), Belinda Fuller ("Fuller"), and Luane Jones ("Jones")[37]: Haynes (Caucasian) was upgraded to full-time instructor in the LPN program; Fuller was changed to full-time status and assigned LPN clinical and content courses.[38] Furthermore, Simmons alleges, other part-time teachers (all Caucasian) were added by Gadsden State.

As further alleged evidence of disparate treatment, Simmons asserts that students complained about certain Caucasian instructors, but the College did not discipline those instructors. Relying upon the Faculty Data Forms for 2000-20002 submitted by the College to the Alabama Nursing Board, Simmons cites the following changes for the College's African-American staff: Alissa Green, a part-time instructor, was removed from part-time teaching responsibility after the 2000-2001 year, Dr. Foster was transferred from the LPN program in May 2001 and assigned to the RN program,[39]

---

conferences in public areas of the hospital.

    Simmons argues that the termination letter did not mention sexual harassment. Gadsden State counters as follows: "Although the letter of termination did not specifically set forth the sexual harassment policy, it clearly states that such makes reference to the reference to abusive language in the presence of students hospital staff and visitors in the hospital setting and that she was charged with 'verbally abusing students. (*sic*)'"

    In the parties' submissions, the court notes, it has not found a copy of the faculty handbook section cited in (d).

    [37]   Unlike other teachers, Simmons notes, Jones hold only a two-year degree.

    [38] Defendant alleges that no source was listed for this evidence and thus the College cannot admit or deny it. However, plaintiff cites the evidence to submitted Faculty Data Forms for 2000-2001 and 2001-2002.

    [39] Foster retired in May 2002. Notably, the court observes, Culverhouse testified that she was appointed as President of Gadsden State effective on September 1, 2001. Regarding the administrative change where Foster changed titles/status at the school, Culverhouse testified: "I think that change was made prior to me coming to Gadsden State."

and of course Simmons was terminated.

Plaintiff relies on Alissa Green's sworn statement as follows. Green completed her LPN studies at Gadsden State in August 1991. During her studies, Green never saw Simmons behave inappropriately. From 1997-2000, when Green taught clinical courses with Simmons, she never witnessed inappropriate behavior on Simmons's part. Throughout this period, the cafeteria was the site for pre-clinicals with students, and staff was never reprimanded for use of this area. Green attended the predetermination hearing with Culverhouse as well as the Fair Dismissal Hearing.

Simmons also highlights the sworn statement of Marcus Montgomery, a former part-time LPN instructor.[40] In 1996, Montgomery stated, he taught a clinical rotation at Riverview and saw Simmons daily. He stated that there was no set time to be "on the floor" as the patients had nurses who were responsible for their care. The variability depended on the preparation of the students because they were there to learn. Montgomery stated that there were no conference areas on the floor, so other areas were used for pre-clinicals. According to Montgomery, he had never heard Simmons use inappropriate language or witnessed her fall asleep during class. Finally, Montgomery deemed the College's criticisms "comical" and "tragic" in light of Simmons's exemplary teaching career and long service to Gadsden State.

## PROCEDURAL HISTORY

Simmons appealed her dismissal pursuant to the Alabama Fair Dismissal Act. *See* Ala. Code § 36-26-106 (1975). Although Simmons's administrative appeal was initiated in the fall of 2002, trial of the matter was continued until April 2003 due to conflicts. On February 28,

---

[40] Montgomery is currently a Risk Manager at UAB. He began his nursing training under Simmons in 1981. From there he completed his RN studies and received a Bachelor's Degree in Business Administration and a law degree.

18

2003, Simmons sued Gadsden State, alleging racial discrimination and retaliation.[41]  In May

2003, Chairman Ludger Martin of the Fair Dismissal Act hearing panel died.[42]  On July 9, 2003,

Gadsden State filed a motion to  stay all proceedings before this court, including discovery,

pending the outcome of Simmons's Fair Dismissal Act hearing.  On August 25, 2003, this court

denied Gadsden State's motion to stay.  On October 20, 2003, Simmons filed a motion to strike

the Fair Dismissal Act hearing transcript as evidence supporting defendant's summary judgment

motion, which this court denied.  The court now considers the parties' summary judgment

submissions and defendant's motion to strike Works's sworn statement.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as

to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary

judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323.

"It is never enough [for the movant] simply to state that the non-moving party could not meet their

burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The

non-moving party then bears the burden of pointing to specific facts demonstrating that there is a

---

[41] Specifically, Simmons's complaint alleges: Title VII racial discrimination in Gadsden State's treatment of her while employed as well as its termination of her employment (Count One); § 1981 and § 1981(a) racial discrimination, including deprivation of the right to make or enforce contracts enjoyed by similarly situated white employees (Count Two) and deprivation of income and other benefits; and retaliatory discharge in violation of Title VII, § 1981, and § 1981(b) (Count Three).

[42] The court is not aware whether a new panel has been convened.  Apparently, the college requested direction from the Attorney General regarding how the process should be continued.

genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

## MOTION FOR SUMMARY JUDGMENT

### I.    Defendant's Motion

#### A.    Introduction

Defendant generally argues: (1) The College's conduct as alleged by Simmons does not rise to the level of racial discrimination required by *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)[43]; (2) Gadsden State's actions were based on legitimate business/educational reasons rather than unlawful discrimination; (3) Simmons has failed to prove causation as required for a retaliation

---

[43] *Meritor*, the court observes, is a sexual harassment case.

claim (relying upon *Clark County School Dist. v. Breeden*, 121 S. Ct. 1508, 1510 (2001)); and (4) Gadsden State is entitled to immunity for plaintiff's § 1981 and Title VII claims.[44]

### B.      Sovereign Immunity/Eleventh Amendment and Qualified Immunity[45]

Gadsden State contends that the Eleventh Amendment to the U.S. Constitution[46] and qualified immunity bar plaintiff's Title VII and § 1981 claims.  While the instant case involves an Alabama citizen's suit against an agency of Alabama, Gadsden State argues, the Supreme Court has long "understood the Eleventh Amendment to stand for not so much for what it says, but for the presupposition . . . which it confers." *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996). Defendant relies upon *Kimmel v. Fla. Bd. of Regents*, 120 S. Ct. 631, 640 (2000):

> Accordingly, for over a century now, [the Supreme Court] ha[s] made clear
> that the constitution does not provide for federal jurisdiction over suits
> against non-consenting states. *College Savings Bank v. Florida Pre-Paid
> Post-Secondary Ed. Expense Bd.,* 119 S. Ct. 2219, 2223 (1991); *Seminole Tribe,
> supra* at 54; *See Hans v. Louisiana*, 120 S. Ct. 631, 640 (2000).

Furthermore, Gadsden State argues, the Supreme Court has held: "It is clear . . . that in the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.  This jurisdictional bar applies regardless of the nature of the relief sought." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100

---

[44] Gadsden State cites the Ninth Amendment and *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996).

[45] While defendant asserts qualified immunity as a defense, the court observes, such a claim appears to require suit against an individual official.  Only Gadsden State has been sued in this case.

[46] Gadsden State also refers to "state sovereign immunity."  The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

(1984)(citations omitted).[47]

According to defendant, the Eleventh Circuit recognizes that state colleges and universities are "agencies or instrumentalities" of the state and are immune from suit in federal court by virtue of the Eleventh Amendment. *See Univ. of S. Ala. v. Amer. Tobacco Co.*, 168 F.3d 405, 412 (11th Cir. 1999); *Harden v. Adams*, 760 F.2d 1158, 1163-64 (11th Cir. 1985). Unless Simmons clearly demonstrates the State of Alabama's/Gadsden State's consent to suit, defendant argues, Gadsden State is entitled to sovereign immunity. Here, Gadsden State asserts, the State of Alabama has not consented to this or any suit against Gadsden State or its agents. Gadsden State cites Article I, Section 14 of the Alabama Constitution: "That the State of Alabama shall never be made a defendant in any court of law or equity." *See also Alabama v. Pugh*, 438 U.S. 781, 782 (1978). Pursuant to Section 14, defendant further contends, agencies of the State are also entitled to absolute sovereign

---

[47] *See Carr v. City of Florence*, 916 F.2d 1521, 1534 (11th Cir. 1990)(citing *Hans v. Louisiana*, 134 U.S. 1 (1890))(noting the Supreme Court's holding "'that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens'"). The College observes that Simmons is a resident of Alabama.

The court notes that *Pennhurst* further stated:

[A]s when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. *See Cory v. White*, 457 U.S. 85, 91 (1982).

. . .

While the rule permitting suits alleging conduct contrary to "the supreme authority of the United States" has survived, the theory of *Young* has not been provided an expansive interpretation. Thus, in *Edelman v. Jordan* (citation omitted), the Court emphasized that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. Under the theory of *Young*, such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment.

With these principles in mind, we now turn to the question whether the claim that petitioners violated *state law* in carrying out their official duties at Pennhurst is one against the State and therefore barred by the Eleventh Amendment.

immunity for suits under state law.[48]  Defendant also asserts that Section 14 bars suits under state

law brought in federal court.  *See, e.g., Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp.

1390, 1414 (M.D. Ala. 1998).  Thus, the College concludes, it is entitled to absolute sovereign

immunity.

Regarding immunity under § 1981 and Title VII, the College alleges, it is a political

subdivision of the State of Alabama.  Gadsden State provides the following excerpt from *Morris v.*

*Wallace Community College-Selma*, 125 F. Supp. 2d 1315, 1335-36 (S.D. Ala. 2001)(footnotes

omitted):

> Whether an entity other than the state itself partakes of the state's Eleventh
> Amendment immunity depends on whether it is an "arm of the state." Mt. Healthy
> City School District Board of Education v. Doyle, 429 U.S. 274, 280, 97 S.Ct.
> 568, 50 L.Ed.2d 471 (1977). Whether [the College] is an arm of the state
> protected by the Eleventh Amendment 'turns on its function and character as
> determined by state law.' ... Factors that bear on this determination include the
> definition of 'state' and 'political subdivision,' the state's degree of control over the
> entity, and the fiscal autonomy of the entity." *Fouche v. Jekyll Island--State Park*
> *Authority*, 713 F.2d 1518, 1520 (11th Cir.1983)(quoting *Sessions v. Rusk State*
> *Hospital*, 648 F.2d 1066, 1069 (5th Cir.1981)). A fourth factor, sometimes
> subsumed within the "fiscal autonomy" factor, is "who is responsible for
> judgments against the entity." *Tuveson v. Florida Governor's Council on Indian*
> *Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir.1984). These factors were most recently
> applied by the Eleventh Circuit in *Miccosukee Tribe v. Florida State Athletic*
> *Commission*, 226 F.3d 1226, 1231-34 (11th Cir.2000).
>
> Although the defendants have not applied this factor analysis, the Court is
> satisfied that the College is entitled to Eleventh Amendment immunity. *See*
> *generally Powers v. CSX Transportation, Inc.*, 105 F.Supp.2d 1295, 1299-1301
> (S.D.Ala.2000)(applying the factor analysis to the Alabama Department of
> Transportation). First, Alabama's state law sovereign immunity extends to
> community colleges such as the College. (Citations omitted). Second, the life of
> the College is heavily regulated by the State Board of Education, itself
> presumptively an arm of the state possessing Eleventh Amendment immunity.

---

[48] Gadsden State relies upon the following cases: *Nance by & through Nance v. Matthews*, 622 So. 2d 297,
300 (Ala. 1993); *Alabama State Docks v. Saxson*, 631 So. 2d 943 (1994); *Stark v. Troy State Univ.*, 514 So. 2d 46
(Ala. 1986); *Rutledge v. Baldwin County Commission*, 495 So. 2d 49 (Ala. 1986).

Ala.Code § 16-60-110.4. Third, the College is further regulated by the Chancellor of the Postsecondary Education Department. *Id.* § 16-60-111.5. Fourth, the College depends heavily on the state for funding, *id.* §§ 16-60-111.4(4), (6), -111.5(6), has limited ability to borrow money, *id.* § 16-60-113, and apparently may not issue bonds. *See id.* § 16-60-90 (establishing a separate authority to issue bonds for construction and equipment). Fifth, the plaintiff has made no showing that any monetary relief \*1336 awarded against the College would not come from the state treasury. Finally, other federal courts have held or assumed that Alabama community colleges possess Eleventh Amendment immunity.

In summary, the College partakes of the State's 11th Amendment immunity . . . .

Additionally, the College observes, the Supreme Court has held that the Eleventh Amendment bars actions seeking a monetary award from a state, state agency, or state official/employee sued in his or her official capacity. *See Edelman v. Jordan*, 415 U.S. 651. Gadsden States notes the Supreme Court's state sovereign immunity exception if the state unequivocally waived its immunity or if the applicable congressional legislation is under Section 5 of the Fourteenth Amendment operates as a waiver. *See Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. 573 (1946).[49] Here, defendant asserts, neither Alabama nor Congress has created an exception to 11th Amendment immunity under § 1981, Title VII, the First Amendment, the EPA, or the Equal Protection clause of the 14th Amendment. *See Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. 1981);[50] *Gorman v. Roberts*, 909 F. 1493, 1503

---

[49] In *Downing v. Board of Trustees of the Univ. of Alabama*, 321 F.3d 1017, 1021 (11th Cir. 2003), this court observes, the Eleventh Circuit found: "Congress may abrogate state sovereign immunity, but it can only do so if: (a) 'unequivocally expressed its intention to abrogate the immunity,' through a 'clear legislative statement', and (b) Congress has acted 'pursuant to a valid exercise of power.'"

[50] The court observes that *Downing* (*see supra* note 48) and other cases, including *Smith v. Alabama*, 252 F. Supp. 2d 1317, 1325 at n. 14 (M.D. Ala. 2003), indicate that Title VII represents valid congressional abrogation of the Eleventh Amendment. There may be a more substantial argument as to § 1981 claims. *See Sessions v. Rusk State Hospital*, 648 F.2d 1606 (C.A. Tex. 1981)("Unlike Title VII, Section 1981 contains no congressional waiver of the state's eleventh amendment immunity. This indicates that Congress did not intend by the general language of the Civil Rights Act of 1871 to invoke its fourteenth amendment power"); *Toney v. State of Alabama*, 784 F. Supp. 1542 (M. D. Ala. 1992)("Unlike Title VII, 42 U.S.C. §§ 1981 and 1983 do not contain a congressional abrogation of a state's eleventh amendment immunity.")

(N.D. Ala. 1985).

Moreover, Gadsden State argues, the Supreme Court held: "Officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *See Hafer v. Mellow*, 502 U.S. 21, 23-24 (1981).[51]  According to the College, qualified immunity governs equal protection claims as well as Title VII (*see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1082-83 (11th Cir. 1996)),[52] and protects government officials performing discretionary functions from civil liability if their "conduct does not violate clearly established statutory or constitutional rights." *Caurson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Gadsden State contends that a government official's entitlement to qualified immunity in his or her individual capacity depends whether the defendant public official was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  If the official satisfies this initial burden, the College further contends, the burden shifts to the plaintiff to show lack of good faith in the official's actions by proving that the defendant's actions "violated clearly established constitutional law." *See Zeigler v. Jackson*, 716 F. 2d 879 (11th Cir. 1983).[53]

---

[51] Despite defendant's assertion of qualified immunity for officials performing discretionary functions, the instant case involves suit against an alleged state entity, not an official (as in the cases cited by defendant on this point).

[52] Despite defendant's citation to *Harris* (a Title VII and section 1983), it does not appear to reference qualified immunity.

[53] Gadsden State relies upon *Caurson* for the proposition that the plaintiff must prove first, that the law was clearly established and second, the existence of a genuine issue of material fact that establishes defendant's conduct violated such clearly established law.  *See* 939 F.2d at 1487-88.

## C.   Plaintiff's Title VII Claims

Acknowledging that intentional discrimination may be proved by direct or circumstantial evidence in a disparate treatment case, *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the College argues, Simmons cannot meet her evidentiary burden.  According to the College, it revamped its LPN program in response to a continued decline in student pass rates. As part of this response, the College replaced the then-program director, Dr. Foster, with Dr. Woods, another African-American woman, leaving Dr. Woods to make classroom assignments. Contrary to Simmons's assertions that she was not allowed to teach lecture classes after January 1, 2002, defendant again notes, Simmons was allowed to co-teach a lecture class with Dr. Woods in Spring 2002 (LPN 104).  Furthermore, the College argues, Simmons's new teaching assignments (which she protested in her May 2002 EEOC charge)[54] did not reduce her pay or hours.

Absent direct evidence of discrimination, Gadsden State contends, *McDonnell-Douglas's* burden-shifting analysis applies.  *See* 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  A *prima facie* case of discrimination requires a showing that the plaintiff was treated differently from "similarly situated" persons outside of her protected class. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11ᵗʰ Cir. 1984).  "[A] plaintiff seeking to demonstrate that similarly situated white employees were treated differently must produce evidence that his comparators were 'similarly situated in all relevant respects.'" *Gibbons v. Auburn Univ. at*

---

[54] Specifically, in Simmons's May 22, 2002 EEOC charge, the court notes, Simmons stated: "Since January 3, 2002, and continuing I have been assigned to do only clinicals" and cites the dates of discrimination from 12/12/2001 (earliest) to May 2, 2002 (latest).

*Montgomery*, 108 F. supp. 2d 1311, 1318 (M.D. Ala. 2000).

Here, Gadsden State argues, Simmons has not proven that other LPN instructors were similarly situated in all relevant respects. Specifically, regarding the allegations of sexually explicit acts, cursing, and tardiness in clinical assignments, defendant asserts, Simmons "cannot put forth any proof of any other individual or LPN instructor in general that made such sexually explicit statements to students." Rather than demonstrating unequal treatment, the College argues, the undisputed facts indicate equal treatment and refusal to give preferential treatment to Simmons. If the College had not terminated plaintiff, defendant contends, "it more than likely would be facing a Title IX action for sexual harassment based on Simmons's behavior."

Turning to the plaintiff's retaliation claims, Gadsden State references the causation requirement, *see Clark County School Dist. v. Breeden*, 121 S. Ct. 1508, 1510 (2001), and argues (based on the foregoing) that plaintiff has not met the requirement. Even if Simmons could establish a prima facie case, the College argues, she has not demonstrated pretext behind Gadsden State's reassignments and termination of her. The College relies upon the following excerpt from *Wright v. Southling Corp.*, 187 F.3d 1287, 1289 (11th Cir. 1999):

> Every employment decision involves discrimination. An employer, when deciding who to hire, who to promote, and who to fire, must discriminate among persons. Permissible bases for discrimination include education, experience, and references . . . . Thus, in an employment discrimination suit, the key question usually is: On what basis did the employer discriminate?

> If the College treated Simmons and other tenured LPN employees differently, defendant

asserts, it was because it honestly believed them to be differently situated.[55]  Defendant

concludes:

> The plaintiff cannot refute the obvious and logical reason for her termination, i.e., that she failed to do her job as clinical instructor, potentially endangered patients due to her inexcusable work habits, and described sexual acts and cursed in front of students. Additionally, the plaintiff cannot refute that the instructional reassignments were the decision of a new director, responding to the program sub par pass rates of Gadsden State students on the LPN exam.

## II.   Plaintiff's Opposition

In violation of Title VII and §§ 1981 and 1981a, Simmons argues, the College took

adverse action against her by deciding to "eliminate her academic teaching in January 2002"[56]

and by terminating her in retaliation for her EEOC charge.

### A.   Disparate Treatment[57]

---

[55] The College contends: "An employer who makes a distinction between employees because that employer believes the employees are not similarly situated does not discriminate on an impermissible basis."  *See Pennington v. City of Huntsville*, 93 F. Supp. 2d 1201, 1216 (N.D. Ala. 2000)(citation omitted).

[56] Simmons alleges that race played a motivating role in or contributed to this decision.  Again, defendant criticizes the allegation as inaccurate, *see supra*.

[57] *Wright*, a case relied upon by Simmons, notes the following requirements for a prima facie case of disparate treatment:

> [The Plaintiff] need only establish that (1) an adverse employment action was taken against him, (2) he was qualified for the job position in question, and (3) different treatment was given to someone who differs in regard to the relevant personal characteristic. For instance, if a plaintiff alleges that he was passed over for a job promotion because of his race, then under *McDonnell Douglas* he must establish that (1) he was in fact passed over for the promotion, (2) he was qualified for the higher position, and (3) an individual of a different race was given the higher position. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d at 1333.  If a plaintiff alleges that she was fired because of her sex, then under *McDonnell Douglas* she must establish that (1) she was in fact fired, (2) she was qualified for her position, and (3) she was replaced by a male (or that males with similar qualifications were retained). *See Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

28

A disparate treatment claim requires proof of Gadsden State's discriminatory motive, i.e.,

some causal link between her race and her termination. *See Standard v. A.B.E.L. Servs., Inc.,*

161 F.3d 1318, 1330 (11th Cir. 1998).  According to Simmons, this causal link may be

established by showing direct evidence of discrimination or by employing the *McDonnell*

*Douglas* test for circumstantial or statistical evidence.  *See Harris v. Shelby County Bd. of Educ.,*

99 F.3d 1078, 1083 (11th Cir. 1996).  Contending that the analytical framework and burden of

production varies depending on the method of proof, *see Standard* at 1330, plaintiff discusses

alternately her direct and circumstantial evidence.

### 1.   **Direct Evidence**[58]

Plaintiff argues: "A statement asserted to be a direct evidence is related to the decisional

process and articulated by the decision-maker.  It is not temporally remote from the adverse

action."  Simmons relies upon the Eleventh Circuit's pronouncement in *Wright v. Southland*

*Corp.,* 187 F.3d 1287, 1298 (11th Cir. 1999): "[C]ases are more consistent with a definition of

'direct evidence' as evidence from which a reasonable trier of fact could find, more probably

than not, a causal link between the adverse employment action and a protected personal

characteristic."

"If the evidence consists of direct testimony that the defendant acted with discriminatory

---

[58] Plaintiff defines "direct evidence" as "evidence, which if believed, establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *See Standard* at 1330 (citing *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989)).

Simmons acknowledges that stray remarks by non-decisionmakers and statements by decisionmakers unrelated to the adverse employment decision do not constitute direct evidence of discrimination. *See E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir. 1990).

motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved." *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1556 (11th Cir. 1993). In that type of situation, plaintiff contends, direct evidence alone would be usually enough to defeat a motion for summary judgment. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n. 11 (11th Cir. 1998).[59]

Essentially, Simmons argues, the statement must "reflect a discriminatory attitude" and "tie [] the discriminatory attitude to the relevant employment decision." *See Wright* at 1294-1295 (11th Cir. 1999). Here, Simmons argues, direct evidence exists in the form of Meloun's remarks at the all-white graduation party, where she referred to Simmons as a "black bitch" and promised students and staff that Simmons would not be teaching much longer.[60] According to Simmons, this remark was not a stray remark unrelated to the decision-making process and thus is sufficient to raise a genuine issue of material fact. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)(O'Connor, J., concurring).

Simmons contends Meloun was a key decision maker[61] and acted with racial animus. According to Simmons, "the tone and tenor of the get-together suggested animus toward

---

[59] The cited footnote in *Jones*, the court notes, states:

> Direct evidence is evidence which, if believed, proves the existence of the fact in issue without inference or presumption. So, direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself. This court has marked severe limits for the kind of language to be treated as direct evidence of discrimination. (Emphasis added).

[60] Again, the court observes, this evidence has been contested by defendant's motion to strike the sworn statement of April Works, *see infra*.

[61] Simmons relies on facts cited earlier in this memorandum opinion regarding both Meloun's job title, her direct reporting to Culverhouse, and the alleged all-white graduation party. Dr. Culverhouse testified that she was the ultimate decision maker for termination but received termination recommendations from both Jolly and Meloun.

Blacks." Meloun's remarks, plaintiff asserts, clearly undermined Simmons authority, since they suggested to LPN staff and students that Simmons's job was in jeopardy and encouraged students to file complaints against Simmons as they had against Foster, the former LPN Coordinator. Simmons argues that "black bitch" is clearly the type of "blatant remark" described in *Earley v. Champion Int'l Corp.*, 907 F.2d at 1081-82 (11th Cir. 1990).

Furthermore, Simmons contends, at the next opportunity to make staffing assignments (Spring Term in January 2002) Meloun informed Simmons that she would not be assigned academic classes, allegedly based on an effort to match classes with instructor expertise. At that time, Simmons repeats, she had received only excellent performance and student evaluations and was not the subject of disciplinary action. Furthermore, Simmons alleges, the lower pass rate of LPN students was not mentioned at the time as a reason for the change. As confirmed by Foster's testimony, Simmons contends, "it was well known that the drop in the pass rate coincided with the six-month reduction in the training program."

Following Meloun's alleged remark at the all-white party, plaintiff asserts, she was "sidelined from teaching in January 2002."[62] Furthermore, Simmons argues, after filing her first EEOC charge, "[Simmons] became the subject of an investigation stemming from allegations made by two LPN students who had a history of academic difficulties," which investigation resulted in suspension and being slated for termination.[63] Simmons further contends that Meloun made the following staffing changes consistent with her discriminatory bias against African-

---

[62] Debate over this fact has been described earlier in this memorandum opinion.

[63] The court notes that other students from Simmons's 2002 summer clinical at River also voiced complaints. *See* addendum to July 24, 2002 Jolly memo to Culverhouse. Specifically, Michelle Johnson allegedly mentioned the "blow job" allegations. *See supra.*

Americans: in September 2002, two party-time Caucasian instructors were given full-time status and additional part-time instructors (all Caucasian) were hired.

Regarding Culverhouse, Simmons argues, direct evidence of discrimination can be attributed to the president, since she "rubber stamped" Meloun's recommendation without conducting an independent investigation.[64] *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1248-1249 (11th Cir. 1998).[65]

---

[64] Simmons argues that agency concepts are no stranger to Title VII actions involving educational agencies. *See, e.g., Kramer v. Logan Cty School Dist. No. R-1*, 157 F.3d 620 (8th Cir. 1998); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990); *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997). However, the court notes, neither *Schager* (an ADEA case) nor *Holifield* appear to have educational institutions as parties.

[65] Specifically, the court observes, *Llampallas* (a quid pro quo sexual harassment case finding no cat's paw) provided:

> Several courts have held that even when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her "cat's paw"--i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation, *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990)--causation is established.
>
> *See, e.g., Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir.1996) ("If ... [the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between [the plaintiffs'] protected activities and their subsequent termination, would remain intact."). In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. *See Shager*, 913 F.2d at 405 (stating that in such a situation "[t]he [decisionmaker] would no more be a nonconductor [for discriminatory animus] ... than would be the secretary who typed [the plaintiff's] discharge papers knowing nothing of the [ ] discrimination that lay behind the discharge"); *Burlington Indus.*, 524 U.S. at ----, 118 S.Ct. at 2269. In effect, the harasser *is* the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus. This, however, is not a cat's paw case. Kaylie's decision to suspend and discharge Llampallas was not simply a tacit approval of Blanch's own decision to do the same. Blanch communicated no adverse employment decision regarding Llampallas to Kaylie for his review; nor did she recommend that Kaylie take action against Llampallas.
>
> . . .
>
> When Kaylie received Blanch's phone call, he did not take action against Llampallas based on that threat. Instead, he summoned Llampallas to New York to investigate the situation. Kaylie afforded Llampallas a private audience of several hours, and gave her the opportunity to explain the situation at Hialeah. During that conversation, Llampallas informed Kaylie neither of her sexual relationship with Blanch, nor of the developments upon the demise of that relationship. According to both Llampallas' and Kaylie's testimony, the conversation revolved around Llampallas' work habits and whether Llampallas would be able to run a new Mini-Circuits office away from Blanch. This meeting suffices to except this case from the cat's paw line of cases. *See Willis v. Marion*

As Simmons's direct supervisor, plaintiff argues, Meloun recommended to Culverhouse that Simmons be terminated, and Culverhouse did so without conducting an independent investigation.  Thus, plaintiff argues, Meloun's discriminatory animus should be imputed to Culverhouse.  *See* Fed. R. Evid. § 801(d)(2)(D)("[A] statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is not hearsay); *see also E.E.O.C. v. Watergate and Landmark Condo.*, 24 F.3d 635 (4th Cir. 1994)(deeming non-hearsay age-biased statements by members of ad hoc condo committee who were involved in the decisional process leading up to a recreational manager's termination and thus deemed agents of condo).  Simmons further argues: "Moreover, the statement of Meloun is not offered as to whether she said it.  The issue is not whether Simmons will be gone but rather whether Meloun held a belief as to this particular employment matter.  By definition, this cannot be hearsay.  *See* Fed. R. Evid. § 801(c).  In other words, Meloun's statements qualify as an admission."  Direct evidence exists, Simmons continues, because the individual responsible for making employment recommendations to the College President foretold that Simmons (that "black bitch") would not be here that much longer.  *See Bass v. Board of Cty Comm'rs, Orange Cty, Fl*, 242 F.3d 996, 1004 (11th Cir. 2001).[66]

---

*County Auditor's Office*, 118 F.3d 542, 547 (7th Cir.1997) (excepting from the "cat's paw" line a case in which the decisionmaker investigated a subordinate's motives by meeting with the plaintiff before acting on the subordinate's adverse recommendations).

[66] *Bass* provided in pertinent part:

Bass argues that Chief Moody's statement--made close in time to the decision to offer the Training Instructor positions to other candidates and against the backdrop of the County's affirmative action plans--constitutes direct evidence of discrimination. However, Bass presented no evidence showing that Moody was a decisionmaker or involved in the selection of the Training Instructors. Although Bass attaches significance to the fact that Moody was the chief at the time of the decision, the fact remains that

## 2.     The McDonnell Douglas Framework

Alternatively, Simmons argues, her claims should survive summary judgment under

*McDonnell Douglas*, since language short of direct evidence but displaying racial animus may be

significant evidence of pretext.  *See Smith v. Horner*, 839 F.2d 1530, 1536-37 (11ᵗʰ Cir. 1988).

Additionally, "[d]emonstrating a prima facie case is not onerous, it requires only that the plaintiff

establish facts adequate to permit an inference of discrimination."  *See Lathem v. Dep't of*

*Children and Youth Servs.*, 172 F.3d 786, 792 (11ᵗʰ Cir. 1999)(citation omitted).  To establish a

prima facie case, Simmons contends, the plaintiff must introduce evidence of actions or

decisions by an employer "from which one can infer, if such actions remain unexplained, that it

is more likely than not that such actions were based on a discriminatory criterion illegal under

the Act."  *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978).

Recognizing that conclusory allegations of discrimination are insufficient to prove

pretext, *see Earley* at 1083-84, Simmons argues that a plaintiff employing concrete facts may

establish pretext by showing that a discriminatory reason more likely motivated the employer or

by showing that the employer's proffered explanation is unworthy of belief.  *See Combs v.*

*Plantation Patterns Prods.*, 106 F.3d 1519, 1528 (11ᵗʰ Cir. 1997); *Bogle v. Orange Cty Bd. of*

*County Comm'rs*, 162 F.3d 653, 658 (11ᵗʰ Cir. 1998)(defendant's motion for judgment as a

matter of law would be denied if plaintiff produced "any evidence that would allow a reasonable

---

Moody was not a member of the interview panel and was not involved in the selection
process. Only statements by the persons involved in the decisionmaking process, here the
interview panel members, could constitute direct evidence of discrimination. Therefore,
although Moody's statements may provide significant circumstantial support for Bass's
claims, they do not constitute direct evidence of discrimination. *See Standard.*

jury to disbelieve the proffered reasons for his discharge"). According to Simmons, the combination of plaintiff's prima facie case and disbelief of defendant's proffered reasons constitutes sufficient circumstantial evidence to preclude summary judgment. *See Combs* at 1529.[67]

Simmons contends that she has established a prima facie case of discrimination, i.e., (1) she belongs to a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) under circumstances giving rise to an inference of discrimination or retaliation.[68] Both the elimination of her academic teaching and her termination, Simmons contends, constitute adverse employment actions. *See Davis v. Town of Lake Park, Fl*, 245 F.3d 1232, 1239-40 (11th Cir. 2001).

In the employment discrimination context, plaintiff argues, a person is "qualified" for a particular position if "[s]he meets the criteria that the employer has specified for the position." *See Wright* at 1300(citation omitted). Viewed in the light most favorable to the plaintiff,

---

[67] In *Combs*, plaintiff observes, the court considers whether the record evidence demonstrates such "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions" in the employer's proffered reasons that the reasonable fact finder could find them unworthy of belief. *Id.* at 1538.

Plaintiff further relies on *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)(finding that the difficult factual questions involved in assessing an employer's 'true motivation' render summary judgment inappropriate ordinarily).

[68] However, the court observes, *Wilson v. Bailey* outlined different criteria specifically geared towards reverse discrimination suits: "(3) that he was rejected for the job; and (4) that the job was filled by a minority group member or a woman." *Wilson*, 934 F.2d 301, 304 (11th Cir. 1991).

Another case relied upon by plaintiff, *Holifield*, sets out requirements of a Title VII discrimination claim: "Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job."

plaintiff contends, the evidence shows Simmons was qualified, since she had been positively evaluated by supervisors, students, and anecdotal reports from nurses at her clinical sites.

As the legitimate non-discriminatory reason for changing Simmons's courses, Simmons points out, the College invoked a decline in LPN pass rates. As for the termination decision, Simmons states, the College has cited Simmons's alleged cursing, delaying the students in getting to the hospital floor and distributing medications, and violation of the College's sexual harassment policy. However, plaintiff argues, she has presented both direct and indirect evidence that these proffered legitimate non-discriminatory reasons were pretextual.[69] According to plaintiff, any claim that Simmons "sexually harassed" students should not be available because "that explanation is recently conjured up for the purpose of this litigation."[70] Alternatively, Simmons asserts, "evidence of the shifting explanation for Simmons termination should be deemed evidence of mendacity." According to Simmons, the charges of sexual harassment by virtue of describing a sex act (blow job) only surfaced after Simmons filed a charge with the EEOC.[71]

---

[69] Simmons repeats evidence already discussed in this memorandum opinion.

[70] The Eleventh Circuit, Simmons argues, has held that a defendant cannot satisfy its intermediate burden of production by offering an explanation not available to it at the time of decision. *See Turnes v. AmSouth Bank, N.A.*, 66 FEP 340 (11th Cir. 1994)(poor credit history of applicant not considered when plaintiff's employment application was rejected could not satisfy bank's intermediate burden under *McDonnell Douglas*). Specifically, *Turnes* stated:

> In other words, although it is true that the employer need not *prove* it was actually motivated by the proffered reason, clearly does not relieve the employer from *producing* a reason that was available to it at the time of the decision's making. Moreover, this Court has squarely held that an employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made.

Similarly, Simmons argues, sexual harassment was not a charge at the time of her termination.

[71] Evidence on this point has been detailed earlier in this memorandum opinion, including Simmons's allegation that she was not given this reason before being placed on administrative leave, that sexual harassment was not mentioned in the termination notice (although "abusive language" was mentioned), that Jolly and Woods did not

Additionally, Simmons asks the court to dismiss the explanation for "cutting Simmons' academic teaching status." Furthermore, Simmons repeats, the College falsely suggested that Meloun sought staffing changes because of the drop in LPN scores. A plaintiff who demonstrates that the employer's proffered reasons are inconsistent has provided sufficient evidence of pretext, plaintiff asserts. *See Bechtel Construction Co. v. Sec. of Labor*, 50 F. 3d 926 (11th Cir. 1995);[72] *see also Hinson v. Clinch County Bd of Ed.*, 231 F.3d 821 (11th Cir. 2000)(inconsistencies in explanations support pretext argument). *See also Combs* at 1538; *Desert Palace v. Costa*, 123 S. Ct. 2148 (3003)(direct evidence not required in a mixed motive case).

Based on Foster's testimony, Simmons argues that the College singled out Simmons for conduct that was a long-time accepted practice by other teachers, i.e., conducting pre-clinicals in the cafeteria and allowing students to eat breakfast before going on the floor. Moreover, Simmons argues, it is incredible that the College accepted two students' accounts over those of Reeves and Sims, the Riverview managers who worked with Simmons and denied many of the students' allegations. Additionally, Simmons points out, Jolly's so-called "investigation" at Riverview resulted in the Riverview nurse managers rejecting the students' version of events and impugning the credibility of Morgan, one of Simmons's accusers.[73]

---

ask Riverview staff about sex-related allegations in their visit to Riverview after Simmons was placed on administrative leave, etc.

[72] The court notes that *Bechtel* involved an employer's violations of the whistleblower provisions of the Energy Reorganization Act.

[73] Simmons argues:

> It is implausible that the College did not know that Morgan had been disciplined the very week that she lodged complaints against Simmons. The College, of course, did not care to connect the dots. Meloun seized the moment as her opportunity to launch

Plaintiff then repeats evidence regarding Ivy's and Pollard's testimony. *See supra.* Simmons reiterates her argument that the College disregarded evidence of co-teachers, fellow nurses, and current/former students "to reach its goal: to rid the College of Simmons." Simmons again notes that the late "meds" allegations was not investigated with the Riverview pharmacist and that the Riverview nursing staff stated that "meds" were their responsibility. Moreover, Simmons contends, "President Culverhouse's refusal to review Simmons' performance history or examination of the stellar track record of the LPN program is further evidence of mendacity."[74]  After repeating evidence about the late meds allegation, Simmons contends that she has substantially showed defendants' proffered explanations for its employment decisions to be false. According to Simmons, a fact finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt," *see St. Mary's Honor Center* at 517, leaving discrimination as perhaps the most likely alternative explanation.

**B.   Retaliation**

To prevail on a retaliation claim, Simmons argues, plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse action. *See Stewart v. Happy Herman's Cheshire Bridge Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *Meeks v.*

---

termination proceedings. Meloun's recommendation to Culverhouse was motivated by racial animus. To cover her tracks, she sent Jolly along with Dr. Woods who is an African American. To further hide the mischief, the College through the testimony of its highest ranking supervisors falsely states that Woods was the LPN Coordinator at the time.

[74] The Eleventh Circuit has found: "[w]here a plaintiff has held a job for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *See Crapps v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)(citation omitted); *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999).

*Computer Ass'n Int'l*, 15 F.3d 1013, 1021 (11ᵗʰ Cir. 1994)(the retaliation complained of need not be the "sole cause" of the adverse employment action).  Simmons contends that she need not prevail on her discrimination claim in order to proceed on her retaliation claim.  *See Taylor v. Runyon*, 175 F.3d 861, 869 (11ᵗʰ Cir. 1999).

Indisputably, Simmons argues, the evidence shows she filed charges of racial discrimination on May 22, 2002 and July 3, 2002 and was terminated on September 10, 2002.  As evidence of causation, Simmons asserts, the College and Meloun were aware of Simmons's May 22, 2002 charge of discrimination at the time Culverhouse terminated Simmons.  In light of the preceding evidence, Simmons contends, she has established that the protected activity and adverse action were not wholly unrelated.  *See Hairston* at 920 (11ᵗʰ Cir. 1993).

### C.    Section 1981 as to Injunctive Relief

According to Simmons, section 1981 claims can be brought against state agencies for injunctive relief.  *See Pennhurst State School and Hosp. v. Pennhurst*, 465 U.S. 89, 102-103 (1984).[75]  Section 1981 claims are analyzed in the same manner as Title VII claims.  *See Wright v. Southland*, 187 F.3d 1287, 1298 n. 12 (11ᵗʰ Cir. 1999); *Cross v. Alabama*, 49 F.3d 1490, 1502 (11ᵗʰ Cir. 1990); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11ᵗʰ Cir.

---

[75] For earlier discussion of *Pennhurst, see supra* note 47.  Plaintiffs in *Pennhurst* do not appear to have charged a violation of section 1981.  There, the Supreme Court stated:

> Respondents' amended complaint charged that conditions at Pennhurst violated the class members' rights under the Eighth and Fourteenth Amendments; § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended; the Developmentally Disabled Assistance and Bill of Rights Act; and the Pennsylvania Mental Health and Mental Retardation Act of 1966 (the "MH/MR Act"). Both damages and injunctive relief were sought.

*Id.* at 92 (internal citations omitted).

1998)(recognizing retaliation claims under Section1981).

## III.   **Defendant's Reply**

Contending that Simmons failed to list her claims succinctly in the manner set forth by the court's order of October 14, 2003 order, defendant frames the plaintiff's claims as (1) disparate treatment based on an allegation that Meloun reduced her teaching schedule by restricting her to only clinical classes after January 1, 2002; and (2) termination.  The former claim is meritless, defendant contends, based on Simmons's admission that she taught LPN 104 in that time frame (which was not a clinical).  While admitting changes to some assignments, defendant repeats its contention that such changes were designed "to best utilize the skills and practicabilities of the practical nursing instructors" and included changing the overall LPN program coordinator to Woods (an African-American).

Regarding alleged inconsistencies between Works's testimony at the fair dismissal hearing and later affidavit, defendant argues, the earlier testimony demonstrated that Mullins's statement at the party was not race-related and that the College did not make, adopt, or authorize any such statement.  Even if the alleged Works sworn statement is not stricken, *see infra*, Gadsden State argues, the alleged comments were made in the context of a private party and provide no evidence that Meloun's employment decisions were racially biased.  Defendant argues: "If in fact . . . race was the motive, Connie could have simply not assigned any class duties to Ms. Simmons, thus such does not constitute direct evidence especially given the fact that [] Meloun is not a decision maker regarding hiring and firing [despite plaintiff's suggestion to the contrary].  Only the President, Renee Culverhouse, can hire or fire individuals at Gadsden State Community College."

Next, defendant addresses plaintiff's arguments that: (1) Meloun was an active decision maker and acted with racial animus and (2) direct evidence of discrimination which can be attributed to Culverhouse.  While Works's averment about a Meloun statement has been offered to show a "plan to get rid of Simmons" (and uttered in her capacity as a College decision maker), Gadsden State notes that the party occurred in August 2001 and argues that the intervening fall semester where Meloun did not change Simmons's schedule weakens plaintiff's argument about a temporal link.  Further, defendant notes, the plaintiff has not disputed that some drop occurred in the pass rate of LPN on the licensing test or that wide-scale changes to the LPN program (involving instructors besides Simmons) were made.

Regarding Culverhouse, defendant contends, the contention that Culverhouse "rubber stamped" Meloun's recommendation without conducting an independent investigation is false, as indicated by the September 9, 2002 predetermination hearing before Culverhouse.  At that time, Gadsden State allowed Simmons to call witnesses on her behalf (which she did).  Additionally, defendant argues, Culverhouse spoke with administrators besides Meloun, including Dean Jolly, Dr. Woods, and Jim Pitchford.  Further, defendant notes, Culverhouse asked Jolly to conduct the investigation on her behalf, which involved contacting the entire summer clinical class at issue and obtaining interviews from each student.  This investigation and the subsequent hearing, defendant argues, prompted Culverhouse's decision to terminate Simmons.

Turning to Simmons's October 14, 2003 deposition, defendant argues:

> [Simmons] struggles to come up with a reason as to why she feels she was discriminated against based on race.  She mostly sums up conclusory statements such as that was the way she feels because she was the only black at Gadsden

41

State Community College, obviously forgetting Ms. Woods.  In that deposition she alleges that the coordinators had changed and that was the reason why race made a different after all the years of teaching.  Nowhere in the deposition does she ever contend . . . any of the alleged racial statement *sic* made by Meloun or by Mullins.  In the deposition, Ms. Simmons suggests that Dr. Culverhouse had a racial motive in her termination.[76]

According to defendant, even if the students were lying and Culverhouse "was fooled to believe [the complaining students] despite their lies, such does not amount to racial animus on behalf of Gadsden State.  It would only amount to a mistaken decision."

Turning to the prima facie case of racial discrimination, defendant again notes, plaintiff

---

[76] Defendant provides the following excerpt from Simmons's deposition:

*Q: [You don't know of any reason why Dr. Culverhouse] would dislike you, do you?*
A: Not unless it's just because I am black.
*Q: She would dislike you because you're black?*
A: (Witness nods head affirmatively.)
. . .
*Q: All right and you based that on what?*
A: Well, I am gone and all the white people are still there.
*Q: O.K.  You don't think it had anything to do with what these students testified – or answered.*
A: No.  No, I don't.
*Q: She did not ask — that fact that you think they just all came up here and lied, and Dr. Culverhouse did that because she's white and you're black?*
A: She did not ask them.  She did not investigate herself.
*Q: Well, she was certainly there when she got the reports from Dean Jolly who talked to them, didn't he?*
A: Dean Jolly don't like black people either.
*Q: And Dean Jolly doesn't like black people.  Why is that?*
A: Not this black.
*Q: Why does he not like you?*
A: You would have to ask him that question.
*Q: What evidence do you have that he doesn't like you?*
A: Well, he treated me differently.
*Q: What did he do?*
A: Treated me . . . not like a real person.
*Q: Well, what did he do?*
A: Well, he loaded the deck and kept writing me letters and writing this and writing that and writing this so I was terminated.  You know he didn't try to help keep me there . . . .
*Q: Now, Ms. Simmons, so you think Dean Jolly doesn't like you because he investigated these students' complaints.*
A: No, I didn't say that . . . .
*Q: Well, tell me what evidence do you have that he is racially motivated to discriminate against you.*
A: He never listened to anything I said, never . . . .
*Q: Do you think that's racial discrimination to listen to all the students and take their word for it?*
A: Yes.  He was racially motivated, yes.

42

must show that she was treated differently from similarly situated persons outside her protected

class. *See Olmstead*; *Nicks v. WLCY Radio/Rayhall Communs.*, 738 F.2d 1181, 1186-87 (11th

Cir. 1984). By Gadsden State's account, "[Simmons has] not set forth any evidence that any

other professor acted in the manner in which she acted, giving medications up to three hours late,

using abusive language (that can be interpreted as sexual harassment in front of students

including describing a 'blow job' being given to her significant other); and that such was brought

to the attention of the College.

Regarding her disparate treatment claim, Gadsden State argues, Simmons has not met her

*prima facie* case by showing a similarly situated person outside of her class was treated

differently. Although her class assignments were changed, defendant asserts, Simmons was not

demoted/discharged and did not lose pay/benefits/privileges. *See Burlington Industries v. Ellif*,

19 S. Ct. 2257 (1990).

Defendant also argues that plaintiff has not met the Eleventh Circuit's standards in

*Llampallas*, *see supra*, which stated: "[W]hen the employer makes an effort to determine the

employee's side of the story before making a tangible employment decision affecting that

employee, however, it should not be held liable under Title VII for that decision based only on

its employee's hidden discriminatory motives." *Id.* at 1250.[77] Even if Meloun made race-related

---

[77] The court notes similar statements from *Pennington v. City of Huntsville*:

Where a decision maker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee. *See Wright v. Southland Corp., 187 F.3d 1287, 1304 n. 20 (11th Cir.1999)* (finding that biased employee did not manipulate the final decisionmaker); *Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir.1998)* (finding that decisionmaker's employment decision was not causally related to a subordinate's discriminatory animus); *Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir.1997)* ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant.").

remarks as argued by Works, Gadsden State argues, such statements cannot be imputed to the

College.  Defendant repeats evidence regarding Culverhouse's investigative process and notes

that Simmons did not call April Works to testify at the predetermination hearing on September 9,

2002 (even though she was free to).  Further, defendant argues, Simmons did not make such

"wild accusations" at the time of her termination.  Gadsden State contends:

> Gadsden State . . . offered to Simmons much more of an opportunity in hearing to
> present her side of the story than that which was offered the plaintiff in
> *Llampallas*.  The Eleventh Circuit reversed that trial court's decision based that
> (*sic*) on the fact that the decision maker summoned the plaintiff to investigate
> employment situation and held a private audience with her for several hours,
> giving her the opportunity to explain the situation, and it was only after the
> decision was made.  As the Eleventh Circuit points out, that decision does not
> even have to be the correct decision, or the decision can even be based on a
> scheme or conspiracy by someone with animus toward the plaintiff.[78]

―――――――――――――――――

*See* 261 F.3d 1262 (11th Cir. 2001).

[78] However, the court observes, changes in duties can constitute adverse employment action under certain
circumstances.  The following excerpts may be instructional.

> For these reasons, applying the adverse action requirement carefully is especially important
> when the plaintiff's claim is predicated on his disagreement with his employer's reassignment
> of job tasks. Courts elsewhere have been reluctant to hold that changes in job duties amount
> to adverse employment action when unaccompanied by any tangible harm. *See, e.g., Mungin
> v. Katten Muchin & Zavis,* 116 F.3d 1549, 1557 (D.C.Cir.1997) (agreeing with "other
> circuits [which] have held that *1245 changes in assignments or work-related duties do not
> ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary
> or work hour changes.") (citing, inter alia, *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 886-87
> (6th Cir.1996) and *Crady,* 993 F.2d at 136).

> We do not suggest that a change in work assignments can never by itself give rise to a Title
> VII claim; in unusual instances the change may be so substantial and material that it does
> indeed alter the "terms, conditions, or privileges" of employment. *Cf. McNely v. Ocala Star-
> Banner Corp.,* 99 F.3d 1068, 1077-78 (11th Cir.1996) (holding that district court erred by
> refusing to submit verdict form allowing ADA plaintiff to recover for conduct short of
> termination where plaintiff alleged that he had been relieved of his supervisory duties,
> assigned to clean toilets as a janitor, and later reassigned to shipping department where he
> was expected to perform physical tasks difficult or impossible for him to complete). In the
> vast majority of instances, however, we think an employee alleging a loss of prestige on
> account of a change in work assignments, without any tangible harm, will be outside the
> protection afforded by Congress in Title VII's anti-discrimination clause-- especially where,
> as here, the work assignment at issue is only by definition temporary and does not affect the
> employee's permanent job title or classification.

Gadsden State repeats its alleged legitimate non-discriminatory reasons for both the decision to change Simmons's assignments and to terminate her.[79] Turning to plaintiff's evidence of pretext, defendant refers to its earlier arguments about "the miraculously changed testimony of April Works," argues that Simmons's "abusive language" was cited in all her termination letters, contends that Culverhouse contemplated the "blow job" allegation at all stages in the process (which Gadsden State contends is "in common sense terms . . . viewed by any reasonable person as abusive language and potentially sexually harassing"). Despite plaintiff's contention that no memo referred to sexual harassment or the term "blow job," defendant again highlights the June 24, 2003 Jolly to Culverhouse memorandum which included a student's accusation about "blow job" talk. According to Gadsden State, plaintiff's attorney

---

*Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001):

> Undesirable work assignments, however, are not per se adverse employment actions. *See Doe v. DeKalb Sch. Dist.*, 145 F.3d 1441, 1449 (11 th Cir.1998) (a purely lateral transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment action); *Hariston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8 th Cir.1994) (change in duties or working conditions that causes no materially significant disadvantage, such as a reassignment which results in no diminution in title, salary or benefits, is not an adverse job action); *Whitehead v. Norfolk Southern Ry. Co.*, 53 F.Supp.2d 1380, 1382-83 (M.D.Ga.1999) (same). Plaintiff did not lose any pay or benefits because of any of these transfers, and his contention that assignment to the Transport Unit is sufficiently less prestigious that it constitutes an adverse job action is belied by the fact that he also complains about his transfer from the Transport Unit to Road Patrol.
>
> Moreover, the cases which Plaintiff cites in support of his position are not analogous to this case. In *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir.1998), the Court of Appeals reversed the District Court's finding after a jury trial that Plaintiff had not proved retaliation when Plaintiff, a salesman, filed EEOC charges, and, after the filing, managers who knew of his filing involuntarily transferred him and *sharply reduced the size of his sales territory.* (Emphasis added). Here, Plaintiff's involuntary transfers caused him no significant disadvantages, such as a diminution in title, salary or benefits.

*Simmons v. Neumann*, 1999 WL 1893667 (S.D. Fla. 1999).

[79] These facts have been detailed earlier in this memorandum opinion.

received a copy of this at the Fair Dismissal Hearing.  Additionally, the College argues, it never suggested that Dr. Woods changed the staffing (as falsely indicated by Simmons).[80]

Defendant argues that Culverhouse was faced with negative evidence from all the students in the summer 2002 clinical class except Pollard.  Furthermore, defendant argues, no improper motive can be presumed from Jolly's failure to interview Frank Ivy, since he was not a member of that particular class and thus not an eyewitness to any of the alleged misconduct.  Furthermore, defendant argues, the Riverview nursing staff who were interviewed by Jolly and Woods "could not be present and were not present" as the events unfolded.

It would have been unreasonable, Gadsden State contends, for Culverhouse or any supervisor to ignore evidence from the majority of the actual eyewitnesses in favor of witnesses who were not present (including students who were not members of the class in question, including some who had long since graduated, such as Allisa Green from the 1996 class or Marcus Montgomery from the 1981 classes)).  Gadsden State adds:

> [I]t would be silly for Dr. Culverhouse to call Janet Reeves who was not present during the College course to ask if Ms. Simmons discussed her significant other receiving a blow job in front of students at a place and time absent of (*sic*) Ms. Reeves.  It would not be reasonable to think that Dr. Culverhouse or any other supervisor would contact Frank Ivy, a former student of Gadsden State, who was not enrolled in the class to ask if he heard such statement.  It is safe to assume that the entire world did not attend this clinical class - only the students enrolled.

---

[80] Defendant cites its brief to the court: "The Declaration of Connie Meloun clearly states that Meloun made the changes prior to Dr. Woods being named coordinator."

## MOTION TO STRIKE SWORN STATEMENT OF APRIL WORKS[81]

### I.    Defendant's Motion[82]

Defendant contends that there are inherent, serious inconsistencies between Works's testimony at the Fair Dismissal Hearing on December 13, 2002 and Works's sworn statement before Simmons's attorney (Ms. Gear) on October 18, 2003. Gadsden State argues that the latter should be struck as a "sham affidavit," based upon the following cases: *Thomas v. Alabama Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105 (M.D. Ala. 2003)("When a party has given clear answers to unambiguous questions which negate the existence of a genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony");[83] *Rollins v. Techsouth, Inc.*, 833 F.2d 1525,

---

[81] Some overlap between facts and arguments in this and previous sections of the memorandum opinion is unavoidable.

[82] At the outset, defendant cites the requirements of Rule 56(e) of the Federal Rules of Evidence, i.e., that an affidavit used to support or oppose summary judgment (1) be made on personal knowledge; (2) set forth such facts as would be admissible in evidence; and (3) show affirmatively that the affiant is competent to the matters stated therein.

[83] The court provides relevant excerpts from defendant's cited cases.

*Thomas* involved an African-American employee who brought Title VII race discrimination claims against his employer. The *Thomas* court found the following parts of the affidavit clearly inconsistent with his prior deposition testimony and due to be stricken:

> • In his affidavit, Plaintiff states that he was hired as a Maintenance Supervisor, but in his deposition he admitted that the actual job title of the position which he held when hired was Building and Grounds Supervisor. Pl.'s Dep. at pp. 42-43. In the face of this direct conflict, the contradictory statement in the affidavit is due to be STRICKEN.
> • In his affidavit, Plaintiff states that he was placed on six months probation for dating a teacher and that this probation was extended to one year without explanation. At his deposition, Plaintiff testified that he was only placed on probation one time and that it was for an interpersonal relationship *and* other admitted violations of Defendant's policies and procedures. Pl.'s Dep. at p. 118, line 1 through p. 119, line 19; & p. 128, lines 16-18. Plaintiff's testimony makes it quite clear that the probation was for ninety days and that it was extended for an additional ninety days by a memorandum which explained to Plaintiff why it was being extended. Pl.'s Dep. at p. 118, line 1 through p. 119, line 19; p. 123, lines 1-23; & Ex. 6 to Pl.'s Dep. Consequently, this inherent inconsistency *1114 between Plaintiff's affidavit and his deposition testimony requires the improper portions of the affidavit to be

_____

STRICKEN.
• In his affidavit, Plaintiff states that Pugh called him "big boy" and that he has been discriminated against by remarks Pugh made. Plaintiff's deposition testimony belies this statement. (footnote omitted).  While Plaintiff did testify in his deposition that Pugh called him "big boy," he repeated testified that she did not make any racist remarks to him. *Compare* Pl.'s Dep. at p. 85, line 21 through p. 86, line 6 *with* Pl.'s Dep. at p. 78, lines 5-17; p. 137, line 7 through p. 138, line 1; p. 144, lines 5-17. Given Plaintiff's unequivocal statements at his deposition that Pugh did not made racially offensive remarks or racist statements to him, Plaintiff's attempts in his affidavit to include statements by Pugh in the list of racially offensive remarks must be disregarded and those portions of the affidavit are due to be STRICKEN.

*Rollins* involved a wrongful termination age discrimination claim.  The *Rollins* court stated:

> The alleged conflict between Rollins' deposition and her affidavit involves the evidence of pretext. The following conversation appears in Rollins' deposition:
> Q. When Mr. Crim, Mr. Davis, Mr. Butts were talking to you was anything said to you about your age?
> A. The only thing I was told in that discussion that my job was eliminated and that they didn't have a place for me.

> * * *

> Q. At any particular meeting was anything said about your age?
> A. In numerous lunches we have had age has been brought up.
> Q. By who?
> A. Mr. Davis, Mr. Thrasher, more or less jokingly. Nevertheless it was mentioned.

> * * *

> Q. Anything else?
> A. That happened numerous times.
> . . . Then, in the affidavit presented to oppose the summary judgment, Rollins--for the first time--reported the statements made by Ms. Hill.

> We do not believe that Rollins' affidavit so completely contradicts her deposition as to warrant its exclusion. The questions asked in the deposition refer to meetings at which Rollins was present. Hill's comments, on the other hand, were purportedly made in the course of casual conversation. Earlier in the deposition, when TechSouth's attorneys questioned Rollins about Hill's attitude towards her, they asked her about comments Hill had made regarding the quality of appellant's work. The attorneys never expressly asked whether Hill had ever made statements to appellant indicating an age bias. Because TechSouth's attorneys did not question Rollins on this specific point at the deposition, her failure to discuss Hill's statements does not prove that they were never made. While Rollins' failure to discuss Hill's statements at the deposition may raise an issue regarding Rollins' credibility, it does not establish that the affidavit is a "sham" and should be excluded.

Finally, in *Van T. Junkins*, which held "a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation" and found the subsequent affidavit a sham, the court stated:

1530 (11th Cir. 1987)(before disregarding an affidavit, the court must find some inherent

inconsistency between the affidavit and deposition); and *Van T. Junkins and Assocs., Inc. v. U.S.*

---

Junkins' deposition was taken May 7, 1982 by counsel for the defendant. Junkins testified that Dunbar and Smith, representatives of A & S, contacted him and then visited with him, explaining that they understood he was contemplating building a prefabricated building and wanted also to know if he were interested in being a dealer. Junkins stated he was and that the building would be his office building and also a warehouse for building supplies. He said he also had thought about becoming a dealer for a manufacturer of such buildings. Junkins, Dunbar, and Smith left Junkins' office and went to dinner, which was attended for a portion of the time by Charles Hollis, Superintendent for Junkins and Associates and Stewart Sims, a real estate agent in Pelham, Alabama, where Junkins apparently planned to construct the prefabricated building. Two or three weeks later the three principals met again. Dunbar and Smith brought the contract for the sale of the building and also brought literature about A & S. They mentioned to the restaurant manager where they were dining that Junkins was going to be a new dealer for their company. Charles Hollis, as superintendent for Junkins, signed the contract to purchase the building from A & S on February 24, 1981, two or three days after this meeting.

Junkins makes it clear on deposition that he had been contemplating buying a prefabricated metal building, that representatives of A & S contacted him saying that they had heard he needed a building, and that before he ordered the building no one stated that he had to buy a building from A & S as a condition, a term, or a prerequisite to becoming a dealer. The fact that there was no condition attached to his purchasing the building was made crystal clear in three places in the deposition. He further admitted that he had been told by Dunbar that his application for dealership had to go through a review board and that somebody other than Dunbar had to approve the application. The proposed dealership agreement which was signed by Junkins on May 7, 1981, clearly states that it must be approved by a duly authorized representative of A & S at its main office in Houston. Junkins in his deposition testified that he had attended two years of college and that he had achieved experience and success in the construction business. He described a number of contracts which he had entered into with nationally-known companies. Thus, there is no indication that Junkins was a neophyte in the business world.

In his affidavit Junkins says:

> About two or three weeks thereafter [the first meeting], it must have been a day or so before February 24, 1981, [the day the order for the building was signed] Darryl Dunbar and Kent Smith again came to my office. We again discussed the dealership. It was at that time that Darryl Dunbar told me that I was going to be their new dealer and that the paper work would just be a formality of being hand-carried through. He stated at that time that he had the authority to tell me whether or not I was a dealer.
> Additionally, Junkins stated:
> He [Dunbar] further stated to me that if, in addition, I would purchase one of their buildings then I would be awarded the dealership.

*Indust., Inc.*, 736 F.2d 657 (11th Cir. 1984)(the inherent inconsistency renders the subsequent affidavit a "sham").

Defendant highlights the following information from Works's sworn statement: (1) the August 2001 private graduation party was a "whites only" affair at the home of a student;[84] (2) Meloun stated about Simmons "Don't worry; she's not going to be here . . . that black bitch is not going to be here much longer"; Mullins in Meloun's presence referred to Simmons as a "nigger"; "other students" had been encouraged by their teachers to go to Meloun not Simmons with problems with Dr. Foster because "they stick together [because] they are black"; Works felt the students were used to get Foster fired; one of the part-time teachers told Works after Foster was fired that Simmons was next because she was black; Simmons was not guilty of any of the infractions noted by the College, including vulgar language (although in front of students, instructors Olander and Mullins allegedly cursed and instructor Ford discussed her lack of a sex life); there was no set time to be on the floor at clinicals;  meds were sometimes late because of changes in the curriculum, but as a nurse there was an ongoing problem getting meds administered on a timely basis; no nurse on the clinical floor at Riverview had ever complained about "lateness" to the floor or that pre-clinicals were held in the cafeteria; Works did not observe Simmons belittle students (although instructor Fuller did and "yelled" at students at the nurse's station).

According to Gadsden State, Works gave different testimony at the Fair Dismissal Hearing, including: she remembered one time that nurses complained in her presence about Simmons's students' "lateness" to the floor; during the graduation party, Works, Bren Maddox and Carlaine Graves were out by the car when Mullins told them that Simmons would not be teaching pediatrics

---

[84] The invitation to the party came from a Gadsden State student rather than a teacher.

any more and that they didn't like her; Mullins later said nobody needed to worry, the problem wouldn't be around much longer; Meloun was at the party; when Mullins commented in the dining room about Simmons, Meloun was in the kitchen (which was connected); Works did not know whether Meloun overheard Mullins or not; Works stated that there were no black people at the party but she didn't know if it was restricted; Mary Margaret Cornelius (a student) told her the party was by invitation only and not to discuss the party with anybody else; Works had heard Mullins and Olander use the words "shit and damn" not towards anyone but in the circumstance such as when something dropped on their toes; Simmons used the word "shit" when she stubbed her toe; and at the party, Mullins made all the statements about Simmons.[85]

According to Gadsden State, these inconsistencies merit striking Works's sworn statement. Although Works gives the impression in her sworn statement that the graduation party was an all white party orchestrated, directed, or planned by a Gadsden State teacher or supervisor, Gadsden State asserts. the party was hosted by a student, and Works was invited by a student. Gadsden State argues: "She doesn't know who all is invited and who isn't, who was invited but didn't show up, or if those that were invited knew who else was invited. She didn't even know if the party was restricted or not."

When questioned at the hearing, Works does not mention Meloun remarking about "that black bitch" or a plan to terminate Simmons, or Mullins calling Simmons a "nigger." Furthermore, Gadsden State contends, at the hearing Works did not recount an unknown part-time teacher telling her that Simmons was next to be fired after Foster because she was black.[86] Moreover, at the hearing

---

[85] The court examines direct quotes from both the hearing and the sworn statement, *see infra*.

[86] However, the court observes, Works may have attributed this statement to instructor Defoe in her sworn statement.

51

Works stated that Mullins said Simmons would not be teaching pediatrics anymore, which Works took as evidence of a plan to fire Simmons. Gadsden State argues that the statement could have meant that Simmons was going to be moved or would not be teaching those particular classes in the future.

Moreover, Gadsden State asserts, Works's sworn statement that no nurse had ever complained about Simmons allowing "lateness" to the floor clearly contradicts her hearing testimony.

Defendant also criticizes the sworn statement as containing inadmissible hearsay. When an affidavit submitted in support of, or in opposition to, a motion for summary judgment contains inadmissible evidence, defendant argues, the court may strike the inadmissible portions of the affidavit and consider the rest. *See Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355 (S.D. Fla. 2001). Hearsay in Works's sworn statement, the College argues, includes the following: Works's allegation that she and other students had been encouraged by their teachers (unnamed) to go to Meloun about problems with Foster; and Works's allegation that a part-time teacher told Works that Simmons would be fired next (after Foster) because Simmons was black.[87]

Furthermore, defendant contends, any alleged statement by Meloun would not qualify as an admission by the College or authorized by the College. While Meloun was the director of the LPN program responsible for curriculum and personnel assignments, the College contends, Meloun never had hiring or firing authority and is not a party to Simmons's complaint. The College asserts that Culverhouse, not Meloun, placed Simmons on administrative leave, sent Simmons the notice of intent to terminate, and sent Simmons the final Notice of Termination.

## II.    Plaintiff's Response

---

[87] *But see supra.*

According to plaintiff, there are no "vast inconsistencies" between the two Works's

statements, and any minor inconsistencies are easily explained. Simmons argues: "[T]here is no

evidence that a clear answer to an unambiguous question of a material matter has been supplanted

by a sham affidavit." According to Simmons, "testimony before the lay panel was disjointed,

incomplete, and distorted as a result of the abuse she was subjected to during her cross examination

by defense counsel." Simmons points out that the administrative hearing operated under relaxed

rules of evidence. Contrary to what occurred at the hearing, Simmons argues, the sworn statement

allowed Simmons "a free opportunity to speak and to elaborate on points that were not brought up

(or permitted) at the hearing."

During Works's direct testimony, Simmons notes, defense counsel was permitted limited

voir dire. Defense counsel interrupted Simmons during one question and stated: "Listen to me,

honey, I'm asking the question." Later, when discussing the graduation party, defense counsel's

remarks included: "Now you trying to raise three children, you don't have time to be doing a lot of

this ol' whiskey drinking, do you?"and "Why I'm asking you that is simply you got three children,

you're common-law married to Steve Burleson."[88] According to Simmons, Works became agitated

---

[88] The court notes the sequence of Works's testimony. First, Ms. Gear directly examined Works. Then, defense counsel was allowed a limited voir dire. The "honey" comment by defense counsel was made. Then, Ms. Gear's direct examination of Works continued. Works testified about the graduation party in detail, including "Susan Mullins told myself Bren Maddox and Carlaine Graves that Ms. Simmons would not be teaching pediatrics no more . . . They don't like her." When Ms. Gear asked her whether anything else was said about Ms. Simmons at the party, Works answered "There was quite a few. There was other people that was around that had been upset with Ms. Simmons because they did not feel that – they felt that they should have had more time for care plans." After the Chairman interrupted with "Ma'am, don't tell us about other people's mental operations, how they felt and so forth. You can tell us what they did or what they said, but I don't think you can arrive at any conclusions", Works continued testifying about student complaints about the care plans and stated: "Okay. Rhonda Fletcher told myself and everybody who would listen that she wanted – had wanted more time to do her care plan for the pediatrics part and that's when the comment was made by Ms. Mullins – and I heard this. This was in front of the whole group. This was separate from the conversation that was close to the car – that nobody needed to worry, the problem wouldn't be around much longer." Then, Ms. Gear begins questioning about Meloun's attendance at the party, which Works confirms. The following excerpt appears relevant to the court:

*Q: Was Meloun at the party?*
A: Yes.
*Q: What was her title when she was there?*
A: The director of nursing.
*Q: She was drinking too?*
A: Yes.
*Q: Was she anywhere near that conversation that went on about "that problem won't –" conversation about Simmons?*
A: She was in – it was a kitchen and dining room is connected together, and she was – we were all gathered in there, so she was there.  Whether she heard it or not, I don't know.
*Q: Who all – you were there, Mullins said it –*
A: Yes.
*Q: Who else was engaged in that?*
A: Susan Ford was also – sat in there.
*Q: Ford?*
A: Uh-huh (indicating yes).
*Q: Mullins?*
A: All of the students – we had all come in.
*Q: Name the students.*
A: Okay.
*Q: You?*
A: You have Mary Margaret Cornelius, Kenneth Pittman, Carlaine Graves, Carla – I'm not sure what Carla's last name was – Rhonda Fletcher, Bren Maddox.
*Q: Any black students there?*
A: There was (*sic*) no black people there.
*Q: Was that one of the restrictions; no blacks to this graduation party?*
A: I have not idea about that.  All I know is when I was invited I was told not to discuss it with anybody else.
*Q: Who?*
A: Mary Margaret Cornelius told myself Carlaine Graves, Theresa Brewster and Karen Bice that the party was by invitation only and not to talk about it with anybody else.
*Q: Have you named all the teachers that were there?  And Susan Mullins is a teacher?*
A: Susan Mullins, Donna Olander, Susan Ford – oh, Ms. Defoe was there also.
*Q: Ms. who?*
A: Ms. Defoe.  She was one of our clinical instructors.


During direct examination, the court notes, Works did not mention any statement by Meloun or the words "nigger" or "black bitch" being used by any instructor attending the party.

    After Works's direct testimony, defense counsel cross-examined Works.  At the outset, Works stated that she felt agitated.  When asked why by defense counsel, Works responded: "The problem – the reason I am agitated about being here is because Ms. Simmons, of all people – and I know you look around, let me tell you why is this woman here?  Why is there not other teachers here?"  After a few more questions, defense counsel made the remarks about "Look, this is not a game.  This is serious for her . . . and to us.  So please answer my questions.  Okay?"  In a few moments, defense counsel made the remarks about Burleson and whiskey drinking.  Then, the following exchange between defense counsel and Works occurred:

    *Q: And who told you Ms. Simmons wouldn't be teaching pediatrics anymore?*
    A: Susan Mullins.
    *Q: Susan Mullins told you that.  All right.  Now, you'd been drinking.  Ms. Mullins been drinking?*
    A: Yes, sir.

and had difficulty answering questions.  Then, defense counsel stated: "You make a lot of facial expressions, are you enjoying yourself today?"  Simmons argues that Works was not permitted to explain why she felt agitated.  Then, Simmons asserts, defense counsel stated: "Ms. Works slash Burleson, you're going to have to answer my question."  Works then stated she felt belittled and was trying to keep from crying.  Simmons contend that the hearing transcript reveals that Works was not allowed to complete her testimony on topics, including personal knowledge of Meloun's comments that Simmons would be terminated from employment; a comparison between how Foster and Simmons were treated; and her pre-clinical experiences with Mullins (since Mullins was not being charged).[89]

When later given the uninhibited chance to speak on topics related to Simmons's lawsuit,

_____

Q: All those girls out there you know been drinking?
A: Yes, sir.
Q: She told you she wasn't going to be teaching pediatrics – she didn't – I mean, did she say anything else to you?  This is your opportunity to just ramble on now.  Go ahead.
A: Not at that time.  Later on when we all were inside the house, the problem with Ms. Simmons would not be there much longer.
Q: Who told you that?
A: That was said by Ms. Mullins, and she –
Q: And who else?  Anybody else?
A: Ms. Susan Mullins.
Q: Nobody else?
A: She pretty much led the show.  She was very – pretty good tipsy.

Then, Works expressed her upset that defense counsel was trying to make her "look like a drunk or something."  After further back and forth, Works stated: "Connie Meloun and Donna Olander, both, told me that if I had any problems with Ms. Simmons because of me talking to them about Dr. Foster for me to come directly to them and let them know because they stick together.  And she said, you know – but it kind of caught me off guard."  The court notes an exchange from the sworn statement: Q: So you were actually directed by two teachers to go to Meloun to comment on Ms. Foster?  A: Yes.  And not to talk to Ms. Simmons about it.  Q: Why?  A: Because they would stick together, because they were black.  Q: That was a specific statement that was made, don't talk to Ms. Simmons about your concerns?  A: Because if you do, you know, they stick together, they're black.  Or they're black; they stick together."  The court notes the "black" aspect to this comment was not mentioned at the fair dismissal hearing.

[89] At the end of the hearing transcript, the court notes, Works was allowed to answer the question posed by Dr. Green on the hearing panel (uninterrupted by counsel for either party): "[B]ased on your specific knowledge, which of the transgressions Ms. Simmons has been charged with would the people who you have just named [Mullins, Ford, and Olander], which of those transgressions, or whatever term you would like to use, did they commit?"

55

plaintiff argues, Works did.[90] She contends that the sworn statement's description of the graduation

party is fully consistent with Works's earlier testimony "but [provides] much greater detail."

---

[90] The court provides a relevant excerpt from Works's sworn statement:

*Q: Let's talk, though, what you heard from anyone there [at the private graduation party] about Ms.*
*Simmons and whether or not she was going to get to stay at the college, any reference to that that evening?*
A: Yeah. Connie Meloun had said that Ms. Simmons was not going to be there much longer, point blank,
in front of a lot of people. They wasn't going to put up with her shit.
*Q: They weren't going to what?*
A: Put up with her shit.
. . . .
*Q: When Meloun said Ms. Simmons would not be here much longer, who was present to hear that?  You*
*heard it?*
A: I heard it.  Carlaine Graves, Kenneth Pittman, Mary Margaret, Amy Bryant, Frank Maddox. Pretty
much everybody that was there.  I mean, Donna Olander and Susan Mullins and Susan Ford were present when we
were out – you know, we was all out talking, you know, and one of us was puking over the side.  Sorry.  And then it
was also brought up – you know, that's when Ms. Mullins had called Ms. Simmons a "nigger."
*Q: What happened before that reference?  What was being – in the context what discussion?*
A: Okay.  The comment – what it all come out for – and I apologize, because this is mean but, okay.  They
were making a comment about Terry Whitcomb.  They didn't want Terry to come because they was afraid that he
would be kissing up to Ms. Simmons and tell her about the party.  Okay.  So the comment was made – and there was
one of the girls that went to school with us, Jennie, who has two mixed children.  She's very nice, but they were kind
of – they wouldn't say anything because they were afraid that because she had black children she would say
something . . . .
*Q: Are you talking about Terry Whitcomb?*
A: Well, no.  Terry Whitcomb didn't get invited because they were afraid Ms. Simmons would find out.
*Q: He would talk?*
A: Because Susan Mullins' exact words is "He would go and tell that nigger."  I'm very sorry.  I hate that
word.
*Q: I'd like to know more, though, about the conversation of Meloun.  Let's focus on that.  When the*
*reference was made, the racial slur, was Ms. Meloun nearby, or was that a separate conversation?*
A: That was a separate conversation. . . .
*Q: No, Meloun, the comments by Meloun saying Simmons wasn't going to be there much longer, what went*
*on before that.  Put that sentence in context.  Do you know what I mean?*
A: I'm trying to remember exactly.  We had several conversations, you know, that was just more like –
more of comments, I guess you could say.  You know.  I hate – I don't want to be wrong – you know, miss a word.  I
feel like I'm – she made several comments.  It's more like in-depth about –
*Q: Well, was Ms. Simmons talked about that evening by the teachers?*
A: Yeah.  It was bad, pretty bad.  She was called a "nigger."  She was called a "black bitch."  She was –
you know – but she was not all the talk.  Like, you know, there was more drunk – you know, more vulgar talk than
that.
*Q: Do you have any idea why the comment was made that she wouldn't be here much longer?  Were they*
*talking about don't worry about her?  I don't want to put words in your mouth.*
A: Yeah, because there was a couple that had pretty much already knew that they were not going to go, they
were not going to graduate.  But they still came to the party.  And that's what -- that was the reason why it come up,
because they were worried.
*Q: And Meloun said?*
A: "Don't worry; she's not going to be here" – "That black bitch is not going to be here that much longer."
*Q: Anything else said that evening in reference to Ms. Simmons that was stated by Connie Meloun?*
A: That's pretty much – That's pretty much it."

Simmons accuses defense counsel (with the approval of the panel chair) of curtailing Works's testimony on the subject of what she "heard" that night at the party, which thus resulted in only limited testimony about Mullins's and Meloun's statements at the party.  While Works did not discuss statements made by Meloun, Simmons notes that Works did state that there were "quite a few statements" made that evening.  Simmons argues Works was not allowed to elaborate on those statements: "Her testimony was derailed on a series of defense objections,[91] and Works focused her testimony on what students had said about Simmons."

In Works's sworn statement, Simmons contends, Works clarifies there were separate faculty conversations that evening about Simmons; Mullins's remarks pertained to pediatrics, while Meloun's remarks pertained to another conversation regarding the College's plans to terminate Simmons from employment.  Moreover, Simmons argues, Works consistently described the graduation party as comprised exclusively of whites.

When Works tried to explain at the hearing why she appeared on behalf of Simmons, plaintiff asserts, defense counsel interrupted her.  Works's testimony was restricted, Simmons argues, after defense counsel scolded Works in the following manner: "Look, this is not a game. This is serious for her."  Additionally, Simmons argues, Works was precluded from discussing how Meloun had encouraged her to complain about Foster.  According to Simmons, the only slight inconsistency in Works's two statements involved whether the nursing staff had complained about lateness, i.e., in hearing testimony, Works stated that nursing staff had complained once about Simmons's students being late to the hospital floor, while in her sworn statement, Works said no one had ever complained.  Simmons also notes that Works testified at the fair dismissal hearing that she

---

[91] *See supra* note 88.

had reported problems with Mullins to Meloun. However, Simmons argues, Works was not permitted to discuss these complaints at the hearing. Finally, Simmons notes, Works testified at the hearing that another teacher (not Simmons) discussed sex matters in the classroom but was interrupted by defense counsel "No, No I'm just talking about – answer my questions please."

## CONCLUSIONS OF THE COURT

The court concludes that Culverhouse (and thus defendant) has articulated non-discriminatory reasons for her decisions and that the plaintiff has not rebutted those purported reasons. The court cannot conclude as a matter of law, however, that Connie Meloun did not make statements which could be considered evidence of discrimination nor that Meloun did not influence Culverhouse's decisions. *See* pp. 40, 41, 44, 45, 49, 50, 57, 67, 69, 70, and 71 of the Culverhouse deposition. Meloun's alleged statements at the party may be at least circumstantial evidence.

The defendant's Eleventh Amendment argument lacks merit, at least as to the Title VII claims.[92] The § 1981 issues, except for the possibility of a difference in damages, would be the same

---

[92] *See In Re: Employment Discrimination Litigation*, 198 F.3d 1305 (11th Cir. 1999)(citing *Fitzpatrick v. Bitzer*, the court concluded unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity when it amended Title VII to cover state and local governments . . . ."); *Allen v. Alabama State Board of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987)(holding "in civil actions invoking Title VII, state defendants lack eleventh amendment protection"). *See supra Downing v. Board of Trustees of Univ. of AL*, 321 F.3d 1017 (11th Cir. 2003).

Regarding section 1981, the court notes the following: *Sessions v. Rusk State Hospital*, 648 F.2d 1606 (C.A. Tex. 1981)("Unlike Title VII, Section 1981 contains no congressional waiver of the state's eleventh amendment immunity. This indicates that Congress did not intend by the general language of the Civil Rights Act of 1871 to invoke its fourteenth amendment power. Therefore, the district court erroneously denied Rusk State Hospital's motion to dismiss the section 1981claim.")(citations omitted); *Toney v. State of Alabama*, 784 F. Supp. 1542 (M.D. Ala. 1992)("Unlike Title VII, 42 U.S.C. §§ 1981 and 1983 do not contain a congressional abrogation of a state's eleventh amendment immunity. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989)(A state is not a "person" within the meaning of § 1983); *Sessions v. Rusk State Hospital* (quotation omitted). There is no doubt that the State of Alabama and the Department of Corrections are entitled to eleventh amendment immunity from suit on Toney's §§ 1981 and 1983 claims. *See Alabama v. Pugh*, 438 U.S. 781, 781 (1978).")

*See also, Butts v. County of Volusia*, 222 F.3d 891 (11th Cir. 2000)("Appellant argues the Civil Rights Act of 1991 amended § 1981 to create a cause of action against state actors and that such a cause of action may rely on a

as the Title VII issues.  The § 1981 claims will be dismissed.[93]

The court will otherwise deny the defendant's motion for summary judgment.  At the trial, however, the court will submit a special verdict to the jury for the jury's specific determination of whether Meloun made statements attributed to her at the party.  The jury's answers may be determinative of a motion for judgment as a matter of law.

The court also notes some degree of acrimony between the attorneys.  Such manifestations will not be tolerated at trial.  Any motions in limine should be filed twenty (20) days in advance of trial.

This ____ day of February, 2004.


**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

respondeat superior theory of liability otherwise prohibited by § 1983 as interpreted in *Jett* and *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  We conclude the amendments did not change § 1981 and § 1983 contains the sole cause of action against state actors for violations of § 1981."; *Ebrahimi v. City of Huntsville Board of Education*, 905 F. Supp. 993 (N.D. Ala. 1995)("[W]hen a state employee seeks to hold the agency employer liable in damages for violations of rights guaranteed by § 1981, the state employee must pursue such claim exclusively under § 1983.  Plaintiff did not invoke § 1983 in Claim One.  The Board of Education is therefore DISMISSED from plaintiff's § 1981 claim. . . .")

[93] The defendant may wish for the court to leave the § 1981 claims until after the return of verdict(s) so as to avoid another trial if this ruling is determined to be incorrect.  If the defendant so requests, the court will vacate this ruling until post-verdict.